# Statutes and Other Public Documents
# Not Regularly Cited In Court of Federal Claims

| Title | Bates No. |
|---|---|
| Secure Embassy Construction and Counterterrorism Act of 1999 | ZA 0063-0071 |
| Response to the Congress on Actions Taken by the Department of State in Response to the Program Recommendations of the Accountability Review Boards on the Embassy Bombings in Nairobi and Dar es Salaam, April 1999 --– Systems/Procedures: Recommendation 1 – Alarms and Drills | ZA 0072-0087 |
| The Budget-In-Brief – Fiscal Year 2001 | ZA 0088-0090 |
| Under Secretary for Management Bonnie R. Cohen and Assistant Secretary for Diplomatic Security David Carpenter – Department of State Security Requirements | ZA 0091-0099 |
| Secretary of State Madeleine K. Albright – Department of State Fiscal Year 2000 Budget Request | ZA 0100-0117 |
| Uzbekistan Consular Information Sheet – 1999 | ZA 0118-0122 |
| Uzbekistan Consular Information Sheet – February 11, 2000 | ZA 0123-0126 |
| Travel Warning – Uzbekistan – July 1, 2005 | ZA 0127-0128 |
| Uzbekistan Consular Information Sheet – September 16, 2005 | ZA 0129-0134 |

(4) by amending subsection (f) (as redesignated by paragraph (2)) to read as follows:

"(f) SUNSET PROVISION.—The Board may not make any grant for the purpose of operating Radio Free Asia after September 30, 2009.".

**SEC. 502. NOMINATION REQUIREMENTS FOR THE CHAIRMAN OF THE BROADCASTING BOARD OF GOVERNORS.**

Section 304(b)(2) of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (22 U.S.C. 6203 (b)(2)), is amended—

(1) by striking "designate" and inserting "appoint"; and

(2) by adding at the end the following: ", subject to the advice and consent of the Senate".

**SEC. 503. PRESERVATION OF RFE/RL (RADIO FREE EUROPE/RADIO LIBERTY).**

Section 312 of the United States International Broadcasting Act of 1994 (22 U.S.C. 6211) is amended to read as follows:

**"SEC. 312. THE CONTINUING MISSION OF RADIO FREE EUROPE AND RADIO LIBERTY BROADCASTS.**

"It is the sense of Congress that Radio Free Europe and Radio Liberty should continue to broadcast to the peoples of Central Europe, Eurasia, and the Persian Gulf until such time as—

"(1) a particular nation has clearly demonstrated the successful establishment and consolidation of democratic rule; and

"(2) its domestic media which provide balanced, accurate, and comprehensive news and information, is firmly established and widely accessible to the national audience, thus making redundant broadcasts by Radio Free Europe or Radio Liberty.

"At such time as a particular nation meets both of these conditions, RFE/RL should phase out broadcasting to that nation.".

**SEC. 504. IMMUNITY FROM CIVIL LIABILITY FOR BROADCASTING BOARD OF GOVERNORS.**

Section 304 of the United States International Broadcasting Act of 1994 (22 U.S.C. 6203) is amended by adding at the end the following subsection:

"(g) IMMUNITY FROM CIVIL LIABILITY.—Notwithstanding any other provision of law, any and all limitations on liability that apply to the members of the Broadcasting Board of Governors also shall apply to such members when acting in their capacities as members of the boards of directors of RFE/RL, Incorporated and Radio Free Asia.".

# TITLE VI—EMBASSY SECURITY AND COUNTERTERRORISM MEASURES

**SEC. 601. SHORT TITLE.**

This title may be cited as the "Secure Embassy Construction and Counterterrorism Act of 1999".

**SEC. 602. FINDINGS.**

Congress makes the following findings:

(1) On August 7, 1998, the United States embassies in Nairobi, Kenya, and in Dar es Salaam, Tanzania, were

destroyed by simultaneously exploding bombs. The resulting explosions killed 220 persons and injured more than 4,000 others. Twelve Americans and 40 Kenyan and Tanzanian employees of the United States Foreign Service were killed in the attack.

(2) The United States personnel in both Dar es Salaam and Nairobi showed leadership and personal courage in their response to the attacks. Despite the havoc wreaked upon the embassies, staff in both embassies provided rapid response in locating and rescuing victims, providing emergency assistance, and quickly restoring embassy operations during a crisis.

(3) The bombs are believed to have been set by individuals associated with Osama bin Laden, leader of a known transnational terrorist organization. In February 1998, bin Laden issued a directive to his followers that called for attacks against United States interests anywhere in the world.

(4) Threats continue to be made against United States diplomatic facilities.

(5) Accountability Review Boards were convened following the bombings, as required by Public Law 99–399, chaired by Admiral William J. Crowe, United States Navy (Ret.) (in this section referred to as the "Crowe panels").

(6) The conclusions of the Crowe panels were strikingly similar to those stated by the Commission chaired by Admiral Bobby Ray Inman, which issued an extensive embassy security report in 1985.

(7) The Crowe panels issued a report setting out many problems with security at United States diplomatic facilities, in particular the following:

(A) The United States Government has devoted inadequate resources to security against terrorist attacks.

(B) The United States Government places too low a priority on security concerns.

(8) The result has been a failure to take adequate steps to prevent tragedies such as the bombings in Kenya and Tanzania.

(9) The Crowe panels found that there was an institutional failure on the part of the Department of State to recognize threats posed by transnational terrorism and vehicular bombs.

(10) Responsibility for ensuring adequate resources for security programs is widely shared throughout the United States Government, including Congress. Unless the vulnerabilities identified by the Crowe panels are addressed in a sustained and financially realistic manner, the lives and safety of United States employees in diplomatic facilities will continue to be at risk from further terrorist attacks.

(11) Although service in the Foreign Service or other United States Government positions abroad can never be completely without risk, the United States Government must take all reasonable steps to minimize security risks.

**SEC. 603. UNITED STATES DIPLOMATIC FACILITY DEFINED.**

In this title, the terms 'United States diplomatic facility' and 'diplomatic facility' mean any chancery, consulate, or other office notified to the host government as diplomatic or consular premises in accordance with the Vienna Conventions on Diplomatic and Consular Relations, or otherwise subject to a publicly available

bilateral agreement with the host government (contained in the records of the United States Department of State) that recognizes the official status of the United States Government personnel present at the facility.

**SEC. 604. AUTHORIZATIONS OF APPROPRIATIONS.**

(a) AUTHORIZATION OF APPROPRIATIONS.—In addition to amounts otherwise authorized to be appropriated by this or any other Act, there are authorized to be appropriated for "Embassy Security, Construction and Maintenance"—

(1) for fiscal year 2000, $900,000,000;
(2) for fiscal year 2001, $900,000,000;
(3) for fiscal year 2002, $900,000,000;
(4) for fiscal year 2003, $900,000,000; and
(5) for fiscal year 2004, $900,000,000.

(b) PURPOSES.—Funds made available under the "Embassy Security, Construction, and Maintenance" account may be used only for the purposes of—

(1) the acquisition of United States diplomatic facilities and, if necessary, any residences or other structures located in close physical proximity to such facilities, or

(2) the provision of major security enhancements to United States diplomatic facilities,

to the extent necessary to bring the United States Government into compliance with all requirements applicable to the security of United States diplomatic facilities, including the relevant requirements set forth in section 606.

(c) AVAILABILITY OF AUTHORIZATIONS.—Authorizations of appropriations under subsection (a) shall remain available until the appropriations are made.

(d) AVAILABILITY OF FUNDS.—Amounts appropriated pursuant to subsection (a) are authorized to remain available until expended.

**SEC. 605. OBLIGATIONS AND EXPENDITURES.**

(a) REPORT AND PRIORITY OF OBLIGATIONS.—

(1) REPORT.—Not later than February 1 of the year 2000 and each of the four subsequent years, the Secretary of State shall submit a classified report to the appropriate congressional committees identifying each diplomatic facility or each diplomatic or consular post composed of such facilities that is a priority for replacement or for any major security enhancement because of its vulnerability to terrorist attack (by reason of the terrorist threat and the current condition of the facility). The report shall list such facilities in groups of 20. The groups shall be ranked in order from most vulnerable to least vulnerable to such an attack.

(2) PRIORITY ON USE OF FUNDS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), funds authorized to be appropriated by section 604 for a particular project may be used only for those facilities which are listed in the first four groups described in paragraph (1).

(B) EXCEPTION.—Funds authorized to be made available by section 604 may only be used for facilities which are not in the first 4 groups described in paragraph (1), if the Congress authorizes or appropriates funds for such a diplomatic facility or the Secretary of State notifies the appropriate congressional committees that such funds will

be used for a facility in accordance with the procedures applicable to a reprogramming of funds under section 34(a) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706(a)).

(b) PROHIBITION ON TRANSFER OF FUNDS.—None of the funds authorized to be appropriated by section 604 may be transferred to any other account.

(c) SEMIANNUAL REPORTS ON ACQUISITION AND MAJOR SECURITY UPGRADES.—On June 1 and December 1 of each year, the Secretary of State shall submit a report to the appropriate congressional committees on the embassy construction and security program authorized under this title. The report shall include—

(1) obligations and expenditures—

(A) during the previous two fiscal quarters; and

(B) since the enactment of this Act;

(2) projected obligations and expenditures for the fiscal year in which the report is submitted and how these obligations and expenditures will improve security conditions of specific diplomatic facilities; and

(3) the status of ongoing acquisition and major security enhancement projects, including any significant changes in—

(A) the budgetary requirements for such projects;

(B) the schedule of such projects; and

(C) the scope of the projects.

**SEC. 606. SECURITY REQUIREMENTS FOR UNITED STATES DIPLOMATIC FACILITIES.**

(a) IN GENERAL.—The following security requirements shall apply with respect to United States diplomatic facilities and specified personnel:

(1) THREAT ASSESSMENT.—

(A) EMERGENCY ACTION PLAN.—The Emergency Action Plan (EAP) of each United States mission shall address the threat of large explosive attacks from vehicles and the safety of employees during such an explosive attack. Such plan shall be reviewed and updated annually.

(B) SECURITY ENVIRONMENT THREAT LIST.—The Security Environment Threat List shall contain a section that addresses potential acts of international terrorism against United States diplomatic facilities based on threat identification criteria that emphasize the threat of transnational terrorism and include the local security environment, host government support, and other relevant factors such as cultural realities. Such plan shall be reviewed and updated every six months.

(2) SITE SELECTION.—

(A) IN GENERAL.—In selecting a site for any new United States diplomatic facility abroad, the Secretary shall ensure that all United States Government personnel at the post (except those under the command of an area military commander) will be located on the site.

(B) WAIVER AUTHORITY.—

(i) IN GENERAL.—Subject to clause (ii), the Secretary of State may waive subparagraph (A) if the Secretary, together with the head of each agency employing personnel that would not be located at the

site, determine that security considerations permit and it is in the national interest of the United States.

(ii) CHANCERY OR CONSULATE BUILDING.—

(I) AUTHORITY NOT DELEGABLE.—The Secretary may not delegate the waiver authority under clause (i) with respect to a chancery or consulate building.

(II) CONGRESSIONAL NOTIFICATION.—Not less than 15 days prior to implementing the waiver authority under clause (i) with respect to a chancery or consulate building, the Secretary shall notify the appropriate congressional committees in writing of the waiver and the reasons for the determination.

(iii) REPORT TO CONGRESS.—The Secretary shall submit to the appropriate congressional committees an annual report of all waivers under this subparagraph.

(3) PERIMETER DISTANCE.—

(A) REQUIREMENT.—Each newly acquired United States diplomatic facility shall be sited not less than 100 feet from the perimeter of the property on which the facility is to be situated.

(B) WAIVER AUTHORITY.—

(i) IN GENERAL.—Subject to clause (ii), the Secretary of State may waive subparagraph (A) if the Secretary determines that security considerations permit and it is in the national interest of the United States.

(ii) CHANCERY OR CONSULATE BUILDING.—

(I) AUTHORITY NOT DELEGABLE.—The Secretary may not delegate the waiver authority under clause (i) with respect to a chancery or consulate building.

(II) CONGRESSIONAL NOTIFICATION.—Not less than 15 days prior to implementing the waiver authority under subparagraph (A) with respect to a chancery or consulate building, the Secretary shall notify the appropriate congressional committees in writing of the waiver and the reasons for the determination.

(iii) REPORT TO CONGRESS.—The Secretary shall submit to the appropriate congressional committees an annual report of all waivers under this subparagraph.

(4) CRISIS MANAGEMENT TRAINING.—

(A) TRAINING OF HEADQUARTERS STAFF.—The appropriate personnel of the Department of State headquarters staff shall undertake crisis management training for mass casualty and mass destruction incidents relating to diplomatic facilities for the purpose of bringing about a rapid response to such incidents from Department of State headquarters in Washington, D.C.

(B) TRAINING OF PERSONNEL ABROAD.—A program of appropriate instruction in crisis management shall be provided to personnel at United States diplomatic facilities abroad at least on an annual basis.

(5) DIPLOMATIC SECURITY TRAINING.—Not later than six months after the date of the enactment of this Act, the Secretary of State shall—

(A) develop annual physical fitness standards for all diplomatic security agents to ensure that the agents are prepared to carry out all of their official responsibilities; and

(B) provide for an independent evaluation by an outside entity of the overall adequacy of current new agent, in-service, and management training programs to prepare agents to carry out the full scope of diplomatic security responsibilities, including preventing attacks on United States personnel and facilities.

(6) STATE DEPARTMENT SUPPORT.—

(A) FOREIGN EMERGENCY SUPPORT TEAM.—The Foreign Emergency Support Team (FEST) of the Department of State shall receive sufficient support from the Department, including—

(i) conducting routine training exercises of the FEST;

(ii) providing personnel identified to serve on the FEST as a collateral duty;

(iii) providing personnel to assist in activities such as security, medical relief, public affairs, engineering, and building safety; and

(iv) providing such additional support as may be necessary to enable the FEST to provide support in a post-crisis environment involving mass casualties and physical damage.

(B) FEST AIRCRAFT.—

(i) REPLACEMENT AIRCRAFT.—The President shall develop a plan to replace on a priority basis the current FEST aircraft funded by the Department of Defense with a dedicated, capable, and reliable replacement aircraft and backup aircraft to be operated and maintained by the Department of Defense.

(ii) REPORT.—Not later than 60 days after the date of enactment of this Act, the President shall submit a report to the appropriate congressional committees describing the aircraft selected pursuant to clause (i) and the arrangements for the funding, operation, and maintenance of such aircraft.

(iii) AUTHORITY TO LEASE AIRCRAFT TO RESPOND TO A TERRORIST ATTACK ABROAD.—Subject to the availability of appropriations, when the Attorney General of the Department of Justice exercises the Attorney General's authority to lease commercial aircraft to transport equipment and personnel in response to a terrorist attack abroad if there have been reasonable efforts to obtain appropriate Department of Defense aircraft and such aircraft are unavailable, the Attorney General shall have the authority to obtain indemnification insurance or guarantees if necessary and appropriate.

(7) RAPID RESPONSE PROCEDURES.—The Secretary of State shall enter into a memorandum of understanding with the Secretary of Defense setting out rapid response procedures

for mobilization of personnel and equipment of their respective departments to provide more effective assistance in times of emergency with respect to United States diplomatic facilities.

(8) STORAGE OF EMERGENCY EQUIPMENT AND RECORDS.—All United States diplomatic facilities shall have emergency equipment and records required in case of an emergency situation stored at an off-site facility.

(b) STATUTORY CONSTRUCTION.—Nothing in this section alters or amends existing security requirements not addressed by this section.

**SEC. 607. REPORT ON OVERSEAS PRESENCE.**

(a) REVIEW.—The Secretary of State shall review the findings of the Overseas Presence Advisory Panel of the Department of State.

(b) REPORT.—

(1) IN GENERAL.—Not later than 120 days after submission of the Overseas Presence Advisory Panel Report, the Secretary of State shall submit a report to the appropriate congressional committees setting forth the results of the review conducted under subsection (a).

(2) ELEMENTS OF THE REPORT.—To the extent not addressed by the review described in subsection (a), the report shall also—

(A) specify whether any United States diplomatic facility should be closed because—

(i) the facility is highly vulnerable and subject to threat of terrorist attack; and

(ii) adequate security enhancements cannot be provided to the facility;

(B) in the event that closure of a diplomatic facility is required, identify plans to provide secure premises for permanent use by the United States diplomatic mission, whether in country or in a regional United States diplomatic facility, or for temporary occupancy by the mission in a facility pending acquisition of new buildings;

(C) outline the potential for reduction or transfer of personnel or closure of missions if technology is adequately exploited for maximum efficiencies;

(D) examine the possibility of creating regional missions in certain parts of the world;

(E) in the case of diplomatic facilities that are part of the Special Embassy Program, report on the foreign policy objectives served by retaining such missions, balancing the importance of these objectives against the well-being of United States personnel; and

(F) examine the feasibility of opening new regional outreach centers, modeled on the system used by the United States Embassy in Paris, France, with each center designed to operate—

(i) at no additional cost to the United States Government;

(ii) with staff consisting of one or two Foreign Service officers currently assigned to the United States diplomatic mission in the country in which the center is located; and

(iii) in a region of the country with high gross domestic product (GDP), a high density population, and a media market that not only includes but extends beyond the region.

**SEC. 608. ACCOUNTABILITY REVIEW BOARDS.**

Section 301 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (22 U.S.C. 4831) is amended to read as follows:

**"SEC. 301. ACCOUNTABILITY REVIEW BOARDS.**

"(a) IN GENERAL.—

"(1) CONVENING A BOARD.—Except as provided in paragraph (2), in any case of serious injury, loss of life, or significant destruction of property at, or related to, a United States Government mission abroad, and in any case of a serious breach of security involving intelligence activities of a foreign government directed at a United States Government mission abroad, which is covered by the provisions of titles I through IV (other than a facility or installation subject to the control of a United States area military commander), the Secretary of State shall convene an Accountability Review Board (in this title referred to as the 'Board'). The Secretary shall not convene a Board where the Secretary determines that a case clearly involves only causes unrelated to security.

"(2) DEPARTMENT OF DEFENSE FACILITIES AND PERSONNEL.—The Secretary of State is not required to convene a Board in the case of an incident described in paragraph (1) that involves any facility, installation, or personnel of the Department of Defense with respect to which the Secretary has delegated operational control of overseas security functions to the Secretary of Defense pursuant to section 106 of this Act. In any such case, the Secretary of Defense shall conduct an appropriate inquiry. The Secretary of Defense shall report the findings and recommendations of such inquiry, and the action taken with respect to such recommendations, to the Secretary of State and Congress.

"(b) DEADLINES FOR CONVENING BOARDS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the Secretary of State shall convene a Board not later than 60 days after the occurrence of an incident described in subsection (a)(1), except that such 60-day period may be extended for one additional 60-day period if the Secretary determines that the additional period is necessary for the convening of the Board.

"(2) DELAY IN CASES INVOLVING INTELLIGENCE ACTIVITIES.—With respect to breaches of security involving intelligence activities, the Secretary of State may delay the establishment of a Board if, after consultation with the chairman of the Select Committee on Intelligence of the Senate and the chairman of the Permanent Select Committee on Intelligence of the House of Representatives, the Secretary determines that the establishment of a Board would compromise intelligence sources or methods. The Secretary shall promptly advise the chairmen of such committees of each determination pursuant to this paragraph to delay the establishment of a Board.

"(c) NOTIFICATION TO CONGRESS.—Whenever the Secretary of State convenes a Board, the Secretary shall promptly inform the

chairman of the Committee on Foreign Relations of the Senate and the Speaker of the House of Representatives—

"(1) that a Board has been convened;

"(2) of the membership of the Board; and

"(3) of other appropriate information about the Board.".

**SEC. 609. INCREASED ANTI-TERRORISM TRAINING IN AFRICA.**

Not later than six months after the date of the enactment of this Act, the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, shall submit a report to the appropriate congressional committees on a proposed operational plan and site selection to expeditiously establish an International Law Enforcement Academy (ILEA) on the continent of Africa in order to increase training and cooperation on the continent in anti-terrorism and transnational crime fighting.

# TITLE VII—INTERNATIONAL ORGANIZATIONS AND COMMISSIONS

## Subtitle A—International Organizations Other than the United Nations

**SEC. 701. CONFORMING AMENDMENTS TO REFLECT REDESIGNATION OF CERTAIN INTERPARLIAMENTARY GROUPS.**

(a) TRANSATLANTIC LEGISLATORS' DIALOGUE.—Section 109(c) of the Department of State Authorization Act, Fiscal Years 1984 and 1985 (22 U.S.C. 276 note) is amended by striking "United States-European Community Interparliamentary Group" and inserting "Transatlantic Legislators' Dialogue (United States-European Union Interparliamentary Group)".

(b) NATO PARLIAMENTARY ASSEMBLY—

(1) IN GENERAL.—The joint resolution entitled "Joint Resolution to authorize participation by the United States in parliamentary conferences of the North Atlantic Treaty Organization", approved July 11, 1956 (22 U.S.C. 1928a et seq.), is amended in sections 2, 3, and 4 (22 U.S.C. 1928b, 1928c, and 1928d, respectively) by striking "North Atlantic Assembly" each place it appears and inserting "NATO Parliamentary Assembly".

(2) CONFORMING AMENDMENT.—Section 105(b) of the Legislative Branch Appropriation Act, 1961 (22 U.S.C. 276c–1) is amended by striking "North Atlantic Assembly" and inserting "NATO Parliamentary Assembly".

(3) REFERENCES.—In the case of any provision of law having application on or after May 31, 1999 (other than a provision of law specified in subparagraphs (A) or (B)), any reference contained in that provision to the North Atlantic Assembly shall, on and after that date, be considered to be a reference to the NATO Parliamentary Assembly.

**SEC. 702. AUTHORITY OF THE INTERNATIONAL BOUNDARY AND WATER COMMISSION TO ASSIST STATE AND LOCAL GOVERNMENTS.**

(a) AUTHORITY.—The Commissioner of the United States section of the International Boundary and Water Commission may provide

The State Department web site below is a permanent electro
information released prior to January 20, 2001. Please see v
material released since President George W. Bush took offic
This site is not updated so external links may no longer func
us with any questions about finding information.

NOTE: External links to other Internet sites should not be co
endorsement of the views contained therein.

**Response to the Congress on Actions Taken by the Department of State in Response to the Program Recommendations of the Accountability Review Boards on the Embassy Bombings in Nairobi and Dar es Salaam, April 1999**

---

## Systems/Procedures: Recommendation 1
## Alarms and Drills

The Boards noted that vehicle bombs have become the weapon of choice of transnational terrorists. The Boards believed that training our personnel in steps to take in the event of a car bomb attack can reduce injuries and save lives.

Notwithstanding the long history of car bombings, the Boards pointed out that the Department of State did not include vehicular bomb scenarios in posts' Emergency Action Plans (EAPs).

The Boards stated that, given the probability of more car bombs in the future, such contingencies should be provided for in all EAPs, accompanied by the necessary training and drills. The Boards also recommended additional alarm equipment to be used by perimeter guards

**Recommendation 1: Emergency Action Plans for all posts should be revised to provide a "special alarm signal" for large exterior bombs and duck-and-cover practice drills in order to reduce casualties from vehicular bombs. Special equipment should be provided to perimeter guards.**

The Department agrees and is implementing this recommendation. Posts have received additional guidance on large exterior bombs, including vehicle bombs, for their Emergency Action Plans. They have also been advised that drills should involve all mission personnel and encompass all scenarios. The Selectone system installed at all embassies and consulates alerts personnel of emergencies. A specific tone notifies personnel to take cover immediately in the event of a terrorist attack to include a vehicle bomb attack. This is accompanied by verbal announcements. The Department has completed evaluation and testing of new equipment, including how it can be integrated with existing equipment to

enhance its warning and communications capacity. The Department is currently working on an effective means of putting these systems in place as quickly as possible.

In addition, the Department has issued instructions both abroad and at home on personal security practices that could save lives. The widely publicized admonition not to go to windows during outside commotions may have already averted tragedy in Tashkent when mission employees, hearing gunfire at a nearby government building, took cover just before a car bomb exploded and the windows blew in.

**Systems/Procedures: Recommendation 2**
**No Low Threat Posts**

The Boards commented that, in the process of establishing priorities for the allocation of resources and installation of physical security equipment, the Department of State rated posts in threat categories as low, medium, high, or critical. Given the threat of transnational terrorist attacks against our personnel and facilities anywhere in the world, especially to our most vulnerable posts -- many of which are rated "low" or "medium" threat -- the Boards argued that we can no longer accept the idea that any post falls into the lower threat categories.

Both to deter attacks and to enhance protection, the Boards stated that the goal should be to provide all posts a basic and visible level of security and to build additional security layers, treating all posts as potential terrorist targets.

**Recommendation 2: Given the worldwide threat of transnational terrorism which uses a wide range of lethal weapons, including vehicle bombs, every post should be treated as a potential target and the Department of State's Physical Security Standards and policies should be revised to reflect this new reality.**

The Department of State agrees. Revised standards are now in the clearance process. The Department had previously established priorities for the accomplishment of its foreign policy objectives by balancing the objectives sought against such practical considerations as funding, staffing, facility availability, and other limitations.

Security standards for all posts must be approved by the Overseas Security Policy Board (OSPB), which is composed of all agencies represented at U.S. missions abroad and chaired by the Director of the Diplomatic Security Service. An OSPB Working Group has proposed a major revision of OSPB Physical Security Standards to provide that requirements associated with terrorism apply to all threat levels for all facilities where the USG is the sole occupant. These revised standards are now in the clearance process. The expansion of these standards to all threat levels includes, but is not limited to: anti-ram barrier and perimeter protection; hardened guard booths at perimeter vehicle entrances; establishment of minimum 100 feet setback for new office buildings (NOBs) and newly-acquired buildings (NABs), and, to the maximum extent feasible, existing office buildings (EOBs); expansion of blast protection for NOBs; and use of laminated windows for all NOBs and other buildings undergoing major renovation. In addition the Department is also currently testing a variety of types of shatter-resistant film for retrofitting windows in EOBs. The revision also includes a new standard which would require blast vulnerability studies for NABs and EOBs undergoing major renovation.

## Systems/Procedures: Recommendation 3
## Essential Physical Security Measures

The Boards pointed out that over 85 per cent of our posts abroad fall short of the security standards established in response to the Inman Commission findings in 1985. To enhance their security now, the Boards recommended that highest priority should be given to strengthening outer windows and securing window frames to building structures. Similarly, the Boards recommended that interior glass fixtures such as glass desk and table tops should be eliminated.

The Boards recommended further review of interior designs to remove and protect people from windows, poorly constructed interior walls, and blast channeling corridors.

The Boards found that the distance between the street or parking areas and US buildings abroad should be increased. They noted that this can help reduce the force of a bomb blast more than almost any other factor. The Boards advocated consideration of specially designed walls that might help reduce devastation from car bombs, especially where adequate setback cannot be obtained readily.

The Boards noted that posts' vehicle barriers require constant maintenance at a level of sophistication lacking in most countries. The Boards recommended that they be replaced by less complicated and more easily maintained blocking devices.

The Boards recommended that delivery trucks should not be allowed to approach chanceries for off-loading without being first inspected thoroughly at a pre-designated site well away from the embassy, and then accompanied by an embassy security guard to the loading area.

The Boards noted that increased technological and operational counter-surveillance of US installations either by host government forces or by US-hired local guards could serve as a significant deterrent to terrorists. They also advocated upgrades to the Department's counter-surveillance equipment.

**Recommendation 3: For those US diplomatic buildings abroad not meeting Inman standards, essential physical security upgrades should be made immediately and should include inter alia, strengthening all windows with the most technologically advanced safety lamination, obtaining more setback where feasible, constructing special blast perimeter walls as necessary, installing more reliable, easily repairable vehicle barriers, and arranging for off-site delivery truck inspection and additional counter surveillance.**

The Department is aggressively upgrading physical security at all of our facilities that do not meet current standards. A total of $212.9 million was appropriated in the 1999 Emergency Security Appropriation for this purpose. The Department's goal is to install all physical security improvements for which funds have been appropriated within two years. In some cases, setback requirements and compliance with all security standards cannot be obtained without new construction. In those cases, the Department is improving physical security as much as possible, until new facilities can be built as follows:

We immediately allocated funding to 132 posts for physical security improvements.

30 posts recommended acquiring additional property to increase setback. We purchased five properties and expect to complete acquisitions at the remaining posts by the end of Fiscal 1999.

American construction firms will design and install additional major perimeter security measures at 88 posts. These measures include new perimeter walls, compound access controls, security lighting and cameras, ballistic doors and windows, and other security items.

The Department, in cooperation with the Technical Support Working Group, the Defense Threat Reduction Agency, the Army Corps of Engineers, and other organizations, is aggressively pursuing research and testing to identify improved methods of enhancing windows, walls, and structural elements to mitigate blast effects. The Department will utilize laminated glass to protect windows in new facility construction and also, when feasible, as part of major renovations of existing facilities. When the use of laminated glass is not feasible, shatter resistant window file (SRWF) remains the most effective means currently available that can provide an immediate, relatively inexpensive, and universally applicable deterrent against injury from flying glass shards. The Department is also exploring secondary methods of window fragment retention to be used in conjunction with SRWF, such as catcher bars and blast curtains and shades.

The Department has, to date, implemented surveillance detection programs at 120 overseas posts. We fully expect to do so at the remaining posts shortly. This program includes use of host government forces and/or local national guards. The Department believes this program will be one of the cornerstones in the protection of our overseas facilities for the foreseeable future.

## Systems/Procedures: Recommendation 4
## Close Unsafe Chanceries, Move to New Buildings

The Boards observed that there are some chanceries and official premises abroad which are threatened and are extraordinarily vulnerable because of their construction and location, and where enhanced physical security upgrades, such as those in Recommendation 3, cannot provide acceptable interim protection pending construction of new buildings. The Boards considered the risk to lives in such situations as unacceptable.

**Recommendation 4: The Secretary of State should personally review the security situation of embassy chanceries and other official premises, closing those which are highly vulnerable and threatened but for which adequate security enhancements cannot be provided, and seek new secure premises for permanent use, or temporary occupancy, pending construction of new buildings.**

Immediately after the bombings in Nairobi and Dar es Salaam, the Secretary commenced a review of the security situation of overseas posts, requesting threat assessments and inviting recommendations on security improvements from all chiefs of mission worldwide. Soon thereafter, the Department formed and led interagency security assessment teams. Equipped

with technical experts and the most up-to-date information, these teams were dispatched to a carefully selected group of our most vulnerable posts around the world to conduct in-depth security reviews and make specific recommendations. As a result, one post was closed immediately (Dushanbe) and security at others was upgraded. Physical security recommendations were provided on site to officials at all posts visited.

These reviews were used together with information from the Department's regional bureaus and other sources to establish a worldwide security project priority list from which evolved the Department's plans to upgrade or replace facilities overseas. Funding for a few of the most critical projects was included in the FY 1999 emergency security appropriation and the President's FY 2000 budget request.

In addition, on March 9, 1999, the Secretary appointed the Chair and members of the Overseas Presence Advisory Panel (OPAP) which will look at our overseas presence in the context of our national priorities, our resource constraints, and our worldwide security concerns.

## Systems/Procedures: Recommendation 5
## Host Government Security Compliance

The Boards stated that host governments often do not comply with their international legal responsibility of providing security support to our embassies.

**Recommendation 5: Demarches to all governments with whom we have relations should be made regularly to remind them of their obligation to provide security support for our embassies. For those governments whose police forces need additional training to enable them to provide more adequate protection, the Department should provide training under the Anti-Terrorism Assistance (ATA) program. The Department should also explore ways to provide any necessary equipment to host governments to upgrade their ability to provide adequate protection. Failure by a host government to honor its obligations should trigger an immediate review of whether a post should be closed.**

We agree. Contacts with host governments on security matters occur regularly but are usually related to specific security concerns, such as the need for more patrols or the closing of a road near the embassy. We will move forcefully and regularly to remind host governments about their responsibility to protect our facilities, both through demarches and other interactions.

The ATA program is a highly successful and productive effort in which over 20,000 law enforcement officials from more than 90 countries have received training in such areas as explosive detection, VIP protection, and crisis management. Moderate amounts of equipment related to the training have been provided. The curriculum is constantly reviewed and new courses added in light of the prevailing terrorist threat. The program also conducts continual assessments for including personnel from additional countries in training. Since the August 7 bombings, we have undertaken new and substantial initiatives in sub-Saharan Africa and the Newly Independent States. To support this undertaking, the ATA program is preparing to add new training sites to accommodate the expanded number of training courses and students that will result.

Operations at missions with high physical security vulnerabilities, constant credible threats, and a host government which either refuses or is deemed incapable of protecting our facilities will be strong candidates for suspension. One such example is Dushanbe, Tajikistan where operations were suspended in September.

The almost global support our missions received after the East African bombings underscores the extent to which host governments respond to a threat. For example, in Tirana, all the streets surrounding our embassy were closed and barricaded, including the main thoroughfare across the city, until a blast wall could be constructed. In Vienna, the street in front of the embassy was also closed to all traffic.

**Systems/Procedures: Recommendation 6**
**Revise Threat Assessment Criteria**

The Boards believed that, prior to the bombings in East Africa, the analytic process used by the Department of State to determine the level of the threat of terrorism at posts abroad and to compile the Composite Threat List (CTL) was seriously flawed, because it did not take into account important international factors relating to terrorism nor certain host government capabilities or local cultural realities. The Boards commented that, had the threat levels for Nairobi and Dar es Salaam been calculated with these criteria, the levels would have been higher and more realistic than the respectively designated "medium" and "low" levels.

The Boards believed that physical vulnerability factors for each post, such as setbacks, security fences, and surrounding buildings, must also be factored into any threat assessment, given the practice of terrorists to seek out the softest targets. The Boards determined that the Department should create a separate category for terrorism, distinct from indigenous violence arising from domestic instability or civil war.

The Boards also felt that pre-August 7 CTL system relied too heavily on the presence or absence of warning intelligence.

The Boards were pleased to learn of the State Department's recent adoption of more comprehensive criteria in determining political threat levels.

The Boards stated that the intelligence community had paid inadequate attention to the CTL because it incorrectly saw the CTL as merely an internal Department of State bureaucratic process for allocating scarce resources.

**Recommendation 6: The Department of State should radically reformulate and revise the "Composite Threat List" and, as a part of this effort, should create a category exclusively for terrorism with criteria that place more weight on transnational terrorism. Rating the vulnerability of facilities must include factors relating to the physical security environment, as well as certain host governmental and cultural realities. These criteria need to be reviewed frequently and all elements of the intelligence community should play an active role in formulating the list. The list's name should be changed to reflect its dual purpose of prioritizing resource allocation and establishing security readiness postures.**

The Department of State agrees. We are radically adjusting the CTL in order to assign more weight to the threat of transnational terrorism and incorporate factors such as the physical security environment and host country realities. The name of the CTL will be changed to Security Environment Threat List (SETL) to reflect its dual purpose of prioritizing resource allocation and establishing security readiness postures.

The agencies that make up the intelligence community will be involved in the coordination of methodology and threat levels for the political violence/terrorism category of the new SETL. Additionally, these agencies are included among the members of the Overseas Security Policy Board (OSPB), which is responsible for developing threat-based security standards for our overseas missions and has been involved in the coordination of the counter-intelligence and technical categories of the CTL.

### Systems/Procedures: Recommendation 7
### More Regional Security Officers and Marine Security Guards

The Boards believed that, at too many of our diplomatic installations, professional security oversight is inadequate. The Department of State is responsible for 161 embassies abroad, but there are Regional Security Officers (RSOs) in only about 60 per cent of these. Marine Security Guard (MSG) detachments are stationed in some, but not all diplomatic missions abroad to provide a secure environment for officially classified information and, as a concurrent duty, to provide an internal defense against outside attack.

**Recommendation 7: The Department of State should increase the number of posts with full time Regional Security Officers, seeking coverage of as many chanceries as possible. The Department should also work with the Marine Corps to augment the number of Marine Security Guard Detachments to provide coverage to a larger number of US diplomatic missions.**

The Department of State is establishing 37 new Regional Security Officer positions and 106 new Assistant Regional Security Officer positions to augment security at embassies worldwide. The positions were funded from the emergency security appropriation and will be filled during Fiscal Years 1999 and 2000. The addition of these positions will raise the number of posts with security professionals assigned to 172 of 252. Additional positions will be established as fiscal resources permit.

In keeping with the Marine Security Guards Detachment's (MSG Det.) primary function, the protection of classified material, the State Department and the Marine Corps were already in the process of establishing 37 new detachments prior to the bombings. Of 252 posts, this will raise the number of posts covered by MSG Det. from 122 to 159. At that time, the activation schedule through July 2001 involved eleven new detachments. Many posts require extensive renovations to accommodate a new detachment. A new schedule for activation of the remaining detachments will be established in conjunction with the completion of the required construction projects as quickly as resources permit. The Marine Corps advises that it is currently funded only for 14 of the 37 new detachments. To increase the number of new detachments to 37, the Marine Corps will require budgeting and manpower resources. The Department of Defense will assess options to address this increase.

**Systems/Procedures: Recommendation 8**
**Better Training for Security Officers**

The Boards found that one of the critical lessons to be learned from the Nairobi and Dar es Salaam bombings is that security personnel need to understand the modus operandi of terrorists. Security officers need not only intelligence about terrorists, but they need to appreciate and to understand offensive operations and the many ingredients that make for a successful mission. They need to know terrorist intelligence requirements and methods of collection, local support needs, logistical problems and weapons.

The Boards commented that it is not enough for an RSO to receive two to four hours of exposure to explosives and to learn how to fire a weapon in self-defense. In the Boards' view, RSOs need to understand what the terrorist knows about explosives, explosive effects, mortars, rockets, assassination devices, and chemical/biological weapons. The Boards stressed that security officers need to look at their area of responsibility with the eyes of the attacker.

**Recommendation 8: The Department of State should provide all Regional Security Officers comprehensive training on terrorism, terrorist methods of operation, explosive devices, explosive effects, and other terrorist weapons to include weapons of mass destruction such as truck bombs, nuclear devices and chemical/biological weapons. The training must also provide RSOs with the ability to examine their areas of responsibility from the offensive point of view, to look for vulnerabilities as seen through the eyes of the attacker.**

The Department is conducting a comprehensive curriculum review of the Regional Security Officer (RSO) Training Program and is implementing the recommendations of the Boards during this process. Training in counter-terrorism methodology, explosive ordnance disposal, chemical/biological warfare, surveillance detection, and other related topics are being included in the syllabi for the Diplomatic Security Training Center's Basic Special Agent Course, Special Agent In-Service Course, Regional Security Officer Basic Course, and Regional Security Officer In-Service Course. The Diplomatic Security Training Center (DSTC) has doubled the amount of time spent training RSOs on explosive ordnance disposal from one to two days, and plans to expand this training to five days for subsequent classes. The DSTC's Mobile Security Division (MSD) has developed a comprehensive training module for surveillance detection techniques which is being incorporated into the above courses and others. The MSD has also developed a training syllabus for chemical/biological warfare that will be included in overseas training and will also be taught to appropriate domestic personnel. The DSTC is also working with the Counterterrorist Center (CTC) to incorporate elements of CTC's vulnerability and threat assessment methodology into the physical security training provided in RSO courses. Efforts to identify and develop other, appropriate course work are ongoing.

**Systems/Procedures: Recommendation 9**
**Reducing US Profile Abroad**

The Board for Nairobi was struck by the anomaly of the large number of personnel assigned to the US Embassy in Nairobi, a city where it had long been clear that rampant crime and political violence are rife, and where it is now clear that a high threat of terrorism exists.

The Boards believed that this illustrates the need to reexamine the role and size of US missions abroad and the resources necessary to support them.

In this context, the Boards urged a reexamination of staffing and functions at all US missions, and consideration of a return to the concept of Special Embassy Programs (SEPs).

The Boards considered that if the US Government cannot provide resources to maintain and provide security for posts virtually in all countries, including those where US interests are minimal, closing smaller posts and establishing regional posts should be considered.

**Recommendation 9: The Department of State should define the role and functions of each of the US embassies abroad for the coming decade with a view toward exploiting technology more fully, improving their efficiency, ensuring their security, and reducing their overall cost. The Department should look specifically at reducing the number of diplomatic missions by establishing regional embassies located in less threatened and vulnerable countries with Ambassadors accredited to several governments.**

The Department of State will use the reconstruction of Nairobi and Dar es Salaam as an opportunity to apply this recommendation, and in parallel to develop principles and policies applicable to other posts. Specifically, we will review the functions performed at the two posts, and determine which functions can be regionalized; what improved communications and information processing systems will help to reduce field presence and thus the exposure of employees; and how to manage staff presence of represented agencies. Function, staffing, and technology choices will be factored into facilities design.

In addition, March 9, 1999, the Secretary also appointed the Chair and members of the Overseas Presence Advisory Panel (OPAP) which will look at the larger question of our overseas presence in the context of our national priorities, our resource constraints, and our worldwide security concerns.

Panel members come from the highest levels of present and former government service and private enterprise. Mr. Lewis Kaden, a New York corporate lawyer, will chair the panel. He will be joined by Admiral William J. Crowe, Jr., U.S. Navy (Ret.), along with a mix of former Ambassadors, former members of Congress, Chief Executive Officers from various corporations doing business overseas, representatives of various government agencies, and representatives of interest groups such as CARE, the Smithsonian, and the American Federation of Labor. PriceWaterhouseCoopers has been engaged to provide analytical support.

The panel has begun its consultations within the U.S. government, private sector, and the Congress, and is currently visiting 18 posts overseas. It expects to issue its recommendations this summer.

The OPAP's mandate is to look at the level and type of representation required abroad to carry out America's foreign policy interests given resource constraints, advances in

technology, and the worldwide security situation. This will include a close look at the idea of regionalizing certain functions, or even embassies, and the trade-offs entailed in such an approach. The panel will recommend criteria for reshaping our missions overseas to maximize effectiveness and security, and outline a multi-year funding program for construction and related costs to achieve those ends.

In addition, subject to completion of Congressional reprogramming procedures, the Secretary intends to create a new Intelligence and Resources Planning Staff to enhance the Department's strategic planning with the national security community and to coordinate the long-term communications, logistics, security, and space requirements of other agencies for routine and surge operations.

## Systems/Procedures: Recommendation 10
## Revise Physical Security Standards

The Boards observed that the physical security standards mandated by the Department's Security and Policy Handbook (12 FAH-6 OSPB) were developed on the basis of our experience in the mid-1980's.

The Boards commented that the August 7 bombings in Nairobi and Dar es Salaam, as well as other very large bombings against US installations overseas in recent years, require review of these physical security standards in order to validate their continued applicability for all kinds of future threats.

The Boards stated that this review should draw upon the valuable research conducted by the multi-agency Technical Support Working Group. The Boards urged that this review be conducted on a priority basis.

**Recommendation 10: The physical security standards specified in the State Department's Security Standards and Policy Handbook should be reviewed on a priority basis and revised as necessary in light of the August 7 and other large bombings against US installations.**

The priority review of the physical security standards was initiated in September 1998 by an Overseas Security Policy Board (OSPB) Working Group. After concluding its work in December 1998, the Working Group provided a draft of its proposed changes, for information purposes, to the OSPB on January 19, 1999. While the recommended changes are pending State and interagency clearances, they are currently being utilized by the Department for new construction and renovation projects and purchases of security materials. Formal approval of the revisions by the Department and the OSPB is anticipated. Please see the response to Systems/Procedures Recommendation 2.

## Systems/Procedures: Recommendation 11
## One Secure Compound for All Agencies

The Boards noted that the Department of State's security standards and policies cover all

official US premises abroad. They observed that the Nairobi and Dar es Salaam bombings demonstrate that terrorists seek vulnerable targets, and that we must therefore provide enhanced security, not only for embassies, but for all other US government facilities. The Boards urged that when the Department constructs new chanceries in foreign capitals, all USG agencies should either be housed in the chancery itself or in adjacent buildings within the same secure compound as the chancery, with waivers granted only in rare cases.

**Recommendation 11: When building new chanceries abroad, all US government agencies, with rare exceptions, should be located in the same compound.**

The Department agrees with the Boards that, in most cases, new chanceries should be designed to permit USG agencies to be co-located. The Department will pursue memoranda of understanding with the principal tenant agencies stating intent to co-locate their personnel on embassy compounds. We will confer with tenant agencies and the Office of Management and Budget on how funding will be structured. In addition, the Secretary's Overseas Presence Advisory Panel will consider this subject in the context of its recommendations on the configuration of our posts overseas.

## Systems/Procedures: Recommendation 12
## Ensuring a Long Term Capital Building and Security Program

The Boards felt the Department of State's investment in resources to protect the lives of American officials abroad has been entirely inadequate. Following the bombings of our embassy in Beirut and the subsequent Inman Report, the total funds applied to Inman projects from FY 1985 through FY 1995 was $1.46 billion. But, the Boards observed, only 19 embassy chanceries have been constructed and three others underwent extensive security upgrades to meet the prescribed security requirements. Five others, though built before the Inman standards, met the requirements on their own merits. From FY 1996 forward, with the exception of unrequested funds for a chancery in Jerusalem, no monies were appropriated for capital buildings and the program had to be funded from gifts or proceeds of sales of US properties.

The Boards observed that, during the same period, inadequate funds were made available for security upgrades of existing buildings. As a result, with some 252 missions around the world, over 85 per cent of our missions are housed in buildings that fall short of the Inman standards.

The Boards noted that, in the wake of the East African bombings, Congress passed an emergency security supplemental bill of $1.4 billion, of which about $163.5 million will be used to build new chanceries in Nairobi and Dar es Salaam. An additional $150 million allocated from the supplemental will be used to build two other chanceries located in highly vulnerable countries. The supplemental also provided $629 million in funds for essential security upgrades for existing substandard embassies, for the hiring of extra security officers, and for crucial anti-terrorism training for foreign government police forces.

However, the Boards found that significant additional funding will be required to ensure the building of safe chanceries for the long term, and the resources needed to cover the recurring costs of additional security officers and upgrades. The Boards emphasized that

these programs should not be funded at the expense of critical foreign affairs programs and operations. Rather, in the Boards' view, the Administration and Congress need to agree to stable and predictable increases in funding for the International Affairs budget starting in FY 2000 and continuing over the coming decade. The Boards suggested that the Department consider seeking a separate and discrete budgetary spending cap for international affairs (Function 150 funding) as a means for improving prospects for funding all critical programs, including those for security.

The Boards estimated that the State Department over the coming ten years will need a capital building program of $1 billion per year to build the necessary number of chanceries and other buildings that meet the safety requirements and an additional $400 million annually for security upgrades and security officers.

In addition the Boards believed that if the Department is unable to obtain adequate funds for this capital building program, other agencies whose personnel occupy US embassy space should pay rent or otherwise contribute their fair share.

The Boards argued that, with the US GDP amounting to $9 trillion, representing the largest single economy in the world, and with a USG budget of nearly $1.4 trillion in FY 1999, the total of $1.4 billion per year over 10 years for the security of US personnel serving abroad is a small price to pay. The Boards also encouraged the Department to find savings in the costs of US embassies around the world in connection with defining their future role and functions.

The Boards stressed that US government personnel abroad are serving on the forefront of defending and promoting US national security and commercial interests. In the Boards' view, keeping them safe in a reduced, lean profile is a reasonable but necessary cost. The Boards noted that the Administration will need to work with Congress, as it did for the multilateral development banks and UN arrears, to find ways so that these funds fall outside the statutory caps for discretionary funding in the Balanced Budget Act.

The Boards observed that Americans and their colleagues in embassies and posts abroad have died because successive Administrations and Congresses failed to heed the lessons drawn by the Inman report over 14 years ago. The security of Americans overseas was not given priority and the funds were not provided for critical security improvements. This must not happen again.

**Recommendation 12: The Department of State should work within the Administration and with Congress to obtain sufficient funding for capital building programs and for security operations and personnel over the coming decade, while ensuring that this funding should not come at the expense of other critical foreign affairs programs and operations. A failure to do so will jeopardize the security of US personnel abroad and inhibit America's ability to protect and promote its interests around the world.**

The Secretary has been fighting for increased resources for the Department of State since she assumed office. As of mid-1998 her efforts had succeeded to the point of reversing the downward trend of our funding levels, permitting a resumption of hiring in critical State Department areas. After the bombings in Kenya and Tanzania, the Administration requested and Congress approved a $1.4 billion emergency security appropriation to rebuild the two bombed embassies and to make quick security enhancements worldwide.

The Secretary continues to advocate a multi-year funding program to improve the security of our personnel and facilities overseas, engaging the Office of Management and Budget, the President, and Congressional leaders at every opportunity. The recommendations of the Overseas Presence Advisory Panel, due during the summer of 1999, will be used to analyze the specific requirements for funding for capital construction and overseas security enhancements. The Department will coordinate closely with other USG agencies operating overseas to ensure that national security, resources, and general security are adequately considered in the funding debate. Strategic planning and coordination with our "mission partners" will help identify long-term requirements.

The Secretary continually underscores her belief that additional funds for security must be obtained without diverting funds from major foreign affairs programs.

## Systems/Procedures: Recommendation 13
## Firm Chain of Accountability

The Boards noted that the Inman Report in 1985 stated that security activities were hindered by "the lack of a firm and recognized chain of accountability for security matters." The Boards, in examining the embassy bombings in Nairobi and Dar es Salaam, concluded that this problem remains. They observed that none of those interviewed by the Boards could point to a single person having the responsibility and resources necessary for ensuring the security of Americans overseas.

The Boards saw responsibility as dispersed throughout the government, and accountability as unclear. In their view, agencies, bureaus, and offices with programmatic and operational responsibilities are not coordinated with the key policy-making entities to ensure the security of US personnel abroad. The Boards observed that the intelligence community focuses on threats and warnings, while the law enforcement community concentrates on gathering information, collecting and preserving evidence, and pursuing terrorists and other criminals in order to detain, extradite, and try them. The Boards noted that within the Department of State, responsibility for security and counterterrorism issues is dispersed, and in the field the Ambassador is held responsible for the security of all USG personnel at the mission but is handicapped by a lack of resources.

The Boards found that the crux of the problem is accountability. The Boards noted that prior to the Khobar Towers explosion the Pentagon had a similar problem of no one single person being charged with the security of US military units stationed abroad. This was resolved when the Secretary of Defense designated the Chairman of the Joint Chiefs of Staff to be the responsible officer.

**Recommendation 13: First and foremost, the Secretary of State should take a personal and active role in carrying out the responsibility of ensuring the security of US diplomatic personnel abroad. It is essential to convey to the entire Department that security is one of the highest priorities. In the process, the Secretary should reexamine the present organizational structure with the objective of clarifying responsibilities, encouraging better coordination, and assuring that a single high-ranking officer is accountable for all protective security matters and has the authority necessary to coordinate on the Secretary's behalf such activities within the Department of State and**

**with all foreign affairs USG agencies.**

The Secretary of State continues to take a personal and active role in ensuring the security of our people and facilities overseas. She has personally led the fight for increased funding for chancery replacement and security enhancements. The Secretary continuously briefs Administration and Congressional leadership on terrorist and other security threats and the implications for US Government employees and their families. She begins her own senior staff meetings with a security update from the Under Secretary for Management. The Secretary has initiated frequent meetings on security with the Under Secretaries of State. She regularly discusses security issues with the Secretary of Defense and the Director of Central Intelligence. She receives a daily security situation briefing from the Assistant Secretary for Diplomatic Security.

The Secretary is interested in finding ways in which the organization of the Department's security operations might be improved. Accordingly, the Department is undertaking a thorough reexamination of the Department's security structure as suggested by the Boards in this recommendation. The study will develop options for improving the organizational structure of the security function within the Department, particularly with respect to the sharing of management responsibilities among headquarters and field elements and enhancing the Secretary of State's ability to ensure the security of U.S. personnel abroad. The study will also develop recommendations for enhancing intelligence support to the offices responsible for security within the Department of State. In the meantime, the Department is reviewing coordination procedures and preparing guidance for strengthening and expediting them.

## Systems/Procedures: Recommendation 14
## Informing the Public on the Critical Need to Protect US Interests and Personnel Abroad

The Boards noted that the Secretary of State and her senior deputies have launched a vigorous public affairs effort with the Congress, the press and the public to restore adequate levels of funding for foreign affairs over the last two years. The Boards believed that this effort must be expanded, and that new emphasis should be given to funds for security and combating terrorism. To amplify this message, the Boards suggested that the Foreign Service, including former Ambassadors -- both career and non-career -- should be mobilized to help explain to the public that the United States needs to invest more to protect its civilian representatives abroad from terrorism without sacrificing other important foreign policy missions, and that more resources will be needed for this purpose. The Boards urged that other foreign affairs agencies be enlisted to join this effort.

**Recommendation 14: The Department of State should expand its effort to build public support for increased resources for foreign affairs, and to add emphasis on the need to protect US representatives abroad from terrorism, without sacrificing other important foreign policy programs.**

Public outreach has been a top priority for the Secretary throughout her tenure. She and her top officials -- through meetings, Congressional testimony, media appearances, and public events -- have worked energetically to explain the link between the Department's diplomatic

activities and programs overseas and the well being, security, and prosperity of the American people.

State is redoubling these efforts. We have developed an aggressive public communications plan informing the public of the need to protect our representatives and citizens abroad in the face of expanding terrorist threats without sacrificing funding for other foreign policy priorities.

Under this plan, we are:

- promoting media coverage by having Department officials speak to local print and electronic outlets;
- developing feature stories for placement in print and on television that illustrate the comprehensive web of issues;
- encouraging newspapers across the country to print op-eds and other articles by the Secretary and other senior Department officials;
- expanding information on international security and budget issues available to the public on the Department's Web site at www.state.gov, including releasing all published material described herein on the Web site;
- developing speaker programs and town meetings throughout the United States with attendant media coverage;
- providing Department briefings on budget and security issues; and
- disseminating a fact sheet on US diplomatic activities overseas, terrorist threats, and the requirements for enhancing embassy security.

The Secretary is deeply committed to increasing the public's awareness of the importance of the Department's conduct of foreign policy. The Department is bound by several statutes that prohibit it from specifically attempting to enlist the public's support in an effort to sway Congress on a particular issue, such as additional funding. Nevertheless, the Department will do all it can to engage the public on the need to protect our employees overseas within applicable legal restrictions.

**Systems/Procedures: Recommendation 15**
**Prepare for Chemical, Biological, Nuclear Terror**

In the Boards' review of security and counter-terrorism guidance provided to Embassies Nairobi and Dar es Salaam, as well as the Department's terrorism threat analysis system and Emergency Action Plan (EAP) guidelines applicable to all posts, they found no reference to the potential threat of terrorism using biological, chemical or nuclear weapons or materials. The Boards observed that the Administration and Congress have focused considerable attention and resources on defending against and preparing for terrorist attacks in the United States by both domestic and international terrorists using such weapons of mass destruction. The Boards noted, however, that the recent emergency security supplemental appropriation passed in the wake of the East African bombings made no provision for addressing this problem abroad.

While the attacks on Nairobi and Dar es Salaam offered no direct insights for dealing with such emergencies, the Boards concluded that, if Americans are threatened by such attacks at

Case 1:05-cv-01245-EJD Document 13-4 Filed 04/07/2006 Page 26 of 26

home, our missions abroad would appear to be equally or even more exposed. The Boards recommended that the Department's threat analysis, protective security systems, EAP guidelines, training and contingency planning systems should be broadened to address the threat of terrorists using materials of mass destruction.

**Recommendation 15: The Department of State, in coordination with the intelligence community, should advise all posts concerning potential threats of terrorist attacks from the use of chemical, biological or nuclear materials, should establish means of defending against and minimizing the effect of such attacks through security measures and the revision of EAP procedures and exercises, and should provide appropriate equipment, medical supplies, and first responder training.**

We agree. The task of devising effective responses to these threats presents major technical and financial challenges. Although we must begin to respond immediately -- and have done so -- we must also recognize that this will remain a difficult work in progress, reflecting changing threat information and the best and most recent scientific and technical knowledge.

The Department of State has been seriously concerned with the threat of chemical, biological, radiological, and nuclear warfare (CBRN) since the Iran and Iraq war. The expressed interest in chemical and biological weapons by several foreign groups and the changing nature of terrorism increase concerns that such weapons may be used for terrorist purposes.

Looking to the future, State has worked aggressively to improve its posture world-wide vis a vis potential CBRN terrorist attacks. All Department elements working together have established an expanded CBRN protection program, which has components including detection, prevention, training, protection, and consequence management. We will also revise the *Emergency Planning Handbook* to incorporate CBRN incident response, protection, and evacuation. This is a resource intensive program. The Department will identify the resources needed and request additional funds for its implementation, based on the best current threat information and the best and most recent scientific and technical knowledge.

In addition, the Department is bolstering the "front line" of defense by developing training courses in its Antiterrorism Assistance (ATA) program for first responders and crisis management officials in host countries.

The Consequence Management Response Team (CMRT) is the only interagency response team that provides the coordination and connectivity for planning and execution of a combined USG-Host Nation response to the consequences of incidents involving chemical, biological, radiological, or nuclear contaminates. The CMRT members are the on-the-ground USG coordinators and work directly with the country team, the host nation's crisis managers, and the incident site response team. CMRT members are also represented on the State Department's Task Force in Washington, D.C. From these various locations, CMRT members are able to coordinate response requirements at or near real time, using state-of-the-art, secure communications. The CMRT is designed to provide timely status reports and identify essential requirements for the interagency's response.

---

Return to Table of Contents