# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ZOYA ATAMIRZAYEVA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-951 L<br><br>Honorable Edward J. Damich |

## UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING MEMORANDUM

Pursuant to RCFC 12(b)(6), RCFC 12(c), and the Court's April 26, 2006, Order, the United States moves to dismiss the Complaint, in its entirety, for failure to state a claim upon which relief can be granted. As a foreign citizen with no substantial connection with the United States, Plaintiff lacks standing to bring this suit. Moreover, the acts complained of were not committed by the United States government, but rather were effectuated by a foreign government acting on its own. A detailed memorandum in support of this motion follows.

## TABLE OF CONTENTS


Table of Authorities . . . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . . 1

II. FACTUAL BACKGROUND . . . . . . . . . . 2

III. STANDARD OF REVIEW: JUDGMENT ON THE PLEADINGS IS PROPER BECAUSE THE ONLY ISSUES TO BE DECIDED ARE LEGAL ISSUES . . . . . . . . . . 6

IV. ARGUMENT . . . . . . . . . . 7

A. PLAINTIFF LACKS STANDING TO SUE THE UNITED STATES FOR AN ALLEGED VIOLATION OF THE FIFTH AMENDMENT . . . . . . . . . . 7

B. THE UNITED STATES IS NOT LIABLE FOR TAKINGS EFFECTUATED BY A FOREIGN SOVEREIGN . . . . . . . . . . 13

V. CONCLUSION . . . . . . . . . . 20

## TABLE OF AUTHORITIES

### CASES

Anglo Chinese Shipping Co. v. United States,
127 F. Supp. 553, 130 Ct. Cl. 361 (1955) . . . . . . . . . . 16

Anglo-American Trading Corp. v. United States,
109 Ct. Cl. 859 (1948) (per curiam) . . . . . . . . . . 16

Ashkir v. United States,
46 Fed.Cl. 438 (2000) . . . . . . . . . . 7, 12

B&G Enterprises, Ltd. v. United States,
220 F.3d 1318 (Fed. Cir. 2000), cert. denied, 531 U.S. 1144 (2001) . . . . . . . . . . 18

Berlin Democratic Club v. Rumsfeld,
410 F.Supp. 144 (D.D.C. 1976) . . . . . . . . . . 11

Best v. United States,
292 F.2d 274, 154 Ct. Cl. 827 (1961) . . . . . . . . . . 16

Cannon v. City of W. Palm Beach,
250 F.3d 1299 (11th Cir. 2001) . . . . . . . . . . 6

Casa de Cambio v. United States,
291 F.2d 1356 (Fed.Cl. 2002) . . . . . . . . . . 17, 18

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . 6, 7

Custom Temporary Homes, Inc. v. United States,
5 Cl.Ct. 88 (1984) . . . . . . . . . . 18, 19

DM Research v. College of American Pathologists,
170 F.3d 53 (1st Cir. 1999) . . . . . . . . . . 19

El-Shifa Pharmaceutical v. United States,
378 F.3d 1346 (Fed. Cir. 2004) . . . . . . . . . . 9

Erosion Victims of Lake Superior Regulation v. United States,
833 F.2d 297 (Fed. Cir. 1987) . . . . . . . . . . 16, 17

Griggs v. Allegheny County,
369 U.S. 84 (1962) . . . . . . . . . . 18

Hooe v. United States,
218 U.S. 322 (1910) . . . . . . . . . . 14

Johnson v. Eisenstrager,
339 U.S. 763 (1950) . . . . . . . . . . 7, 8

Langenegger v. United States,
756 F.2d 1565 (Fed. Cir.), cert. denied, 474 U.S. 824 (1985) . . . . . . . . . . 8, 14, 15, 17, 19

Larson v. Domestic and Foreign Commerce Corp.,
337 U.S. 682, 69 S.Ct. 1457 (1949) . . . . . . . . . . 13

Nat'l Bd. of YMCA v. United States,
395 U.S. 85 (1969) . . . . . . . . . . 18

NBH Land Co. v. United States,
217 Ct.Cl. 41, 576 F.2d 317 (1978) . . . . . . . . . . 14

New Zealand Lamb Co., Inc. v. United States,
40 F.3d 377 (Fed. Cir. 1994) . . . . . . . . . . 6

Peterson v. United States,
68 Fed.Cl. 773 (2005) . . . . . . . . . . 6

Pi Electronics Corp. v. United States,
55 Fed. Cl. 279 (2003) . . . . . . . . . . 13

Porter v. United States,
496 F.2d 583 (Ct.Cl. 1974) . . . . . . . . . . 15, 16

Russian Volunteer Fleet v. United States,
282 U.S. 481 (1931) . . . . . . . . . . 8

Standard-Vacuum Oil Co. v. United States,
153 F.Supp. 465, 139 Ct. Cl. 113 (1957) . . . . . . . . . . 16

Turney v. United States,
115 F. Supp. 457 (Ct. Cl. 1953) . . . . . . . . . . 9, 10, 17

United States v. Verdugo-Urquidez,
494 U.S. 259 (1990) . . . . . . . . . . 7, 8

**RULES**

RCFC 12(b)(1) . . . . . . . . . . 7
RCFC 12(b)(6) . . . . . . . . . . 1, 7
RCFC 12(c) . . . . . . . . . . 1, 6

**OTHER AUTHORITIES**

C. Wright & A. Miller, Fed. Prac. & Proc. Civ. 3d § 1367 . . . . . . . . . . 6

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS**

## I. INTRODUCTION

Plaintiff's Complaint alleges that she owned a kabob stand known as Café Feruza, which was located adjacent to the United States Embassy in Tashkent, Uzbekistan. In December 1999, Café Feruza was demolished by "local authorities in Tashkent." Complaint ¶ 16. Plaintiff further alleges that the demolition was pursuant to a "demand" made by the United States and was for the benefit of the security of the United States Embassy. Even assuming the allegations as plead by Plaintiff, however, the Complaint should be dismissed as a matter of law.

In addition to the above allegations, Plaintiff admits that she is a foreign citizen and that she is attempting to invoke the Takings Clause of the Fifth Amendment to obtain remuneration for the alleged destruction of property located outside of the United States. Because Plaintiff is a foreign citizen, whose property is located outside the United States, and neither the Plaintiff nor the property have substantial connections with the United States, she may not avail herself of the protections of the Fifth Amendment. As such, she lacks standing to bring this suit, which should be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim.

Plaintiffs' claims should similarly be dismissed because, as Plaintiff admits, the destruction of the property was carried out by representatives of the Government of Uzbekistan, a sovereign nation. Acts of a foreign sovereign may not, however, be imputed to the United States and therefore cannot form the basis of a Takings Claim under the Fifth Amendment.

For all of these reasons, this Court must dismiss Plaintiff's Complaint in its entirety.

## II. FACTUAL BACKGROUND

There are truly only a handful of facts that are material to the resolution of the instant motion to dismiss and, in each case, they are taken directly from Plaintiff's Complaint. The United States will assume the truth of these allegations, as necessary, for purposes of this motion. Thus, there are not factual disagreements to prevent this Court from granting the instant motion.

The material facts are as follows: (1) Plaintiff is "a citizen of the Republic of Uzbekistan." Complaint ¶¶ 1 and 3. (2) Plaintiff was the "owner of a cafeteria called Feruza" ("Café Feruza"), which "was located on property adjacent to the U.S. Embassy in Tashkent, Uzbekistan." Id. ¶¶ 5 and 6. (3) In December 1999, "the local authorities in Tashkent forcibly expelled [Plaintiff] from [Café] Feruza. They seized the property, and destroyed the cafeteria." Id. ¶ 16.[1]

In addition to these material facts, the following facts are provided for the Court's benefit:

In 1999, the United States Embassy to Uzbekistan (the "Embassy") was located at 82 Chilonzarskaya Street, in the Chilonzar District of Tashkent. Exhibit A, Declaration of Yuri Komarov,[2] ¶ 4; Exhibit B, Declaration of Ulugbek Sayedkhodjaev,[3] ¶ 2. A water canal, which is

---

[1]The United States assumes the truth of these facts, as necessary, for purposes of presenting each of its arguments below. The United States does not, however, concede these facts and may offer contrary evidence if the instant motion is unsuccessful and the case proceeds to either a motion for summary judgment or to trial. For example, based upon the current Complaint, the United States lacks the information necessary to determine the truth of Plaintiff's alleged ownership interest in Café Feruza.

[2]From 1996 to 2006, Mr. Komarov was General Services Assistant and Procurement Agent at the United States Embassy in Tashkent. Ex. A ¶ 2.

[3]From 1996 to March 2005, Mr. Sayedkhodjaev was the Assistant to the Regional Security Officer at the United States Embassy in Tashkent. Currently, he is a Supervisor of the Embassy Guard Detail. Ex. B ¶ 3.

approximately 5-6 meters wide and several meters deep, runs across the back of the Embassy compound. Ex. A ¶ 5; Ex. B ¶ 5. Ulugbek Park, which has since been renamed the Gafur Golum Park (the "Park"), is situated across the water canal from the Embassy. Id. Throughout most of 1999, a small stand which sold kabobs and other local dishes was located in the Park. Ex. A ¶ 6; Ex. B ¶ 6. The stand was called Café Feruza. Id.

In August 1998, the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were targeted by terrorist bombs (the "African Bombings"). Complaint at 2. Also, on February 16, 1999, a series of terrorist bombs were detonated in the City of Tashkent. Ex. A ¶ 13; Exhibit C, Declaration of the Honorable Joseph Presel,[4] ¶ 5.

Following the African Bombings, in November 1999, the United States Department of State began encouraging its embassies throughout the world to analyze their security status and to take measures to improve security against vehicle borne bombs. Exhibit D, Declaration of John Bray, ¶ 4.

John Bray was the Regional Security Officer at the Embassy at the time of the African Bombings and throughout 1999. Id. ¶ 2. He recalls conducting a review of the Embassy security following the African Bombings. Id. ¶ 4. The review was primarily driven by concerns over vehicle borne bombs. Id. Mr. Bray concluded that some steps could reasonably be taken to improve security at the Embassy. Id. ¶ 10. From 1999 through 2003, these steps included the addition of bollards along the street in front of the Embassy, a request to the Government of Uzbekistan to increase the security forces dedicated to Embassy security, and a request to the

---

[4]From December 3, 1997 to October 21, 2000, Ambassador Presel was the United States Ambassador to the Republic of Uzbekistan. Ex. C ¶ 2.

Government of Uzbekistan to post signs on the street in front of the Embassy precluding truck traffic on the street. Id. These improvements generally required the approval of the Government of Uzbekistan. Id. ¶ 8. As such, a formal diplomatic note was prepared and sent to the Uzbekistan Ministry of Foreign Affairs, which in turn referred the request to local authorities in Tashkent. Id. For example, in September 1998, the Embassy sent Diplomatic Note 410/98 to the Uzbek Ministry of Foreign Affairs requesting additional police protection for U.S. sites in Tashkent. Ex. B ¶ 8 & Attachment 1.

The security review conducted by Mr. Bray in 1999 also included an analysis of the threat from buildings that were in close proximity to the Embassy, including Café Feruza. Ex. D ¶¶ 5-7. Given the primary concern with vehicle borne bombs, Mr. Bray concluded that the structures around the Embassy did not pose a threat. In particular, because of the natural barrier created by the water canal between the Embassy and Café Feruza, Mr. Bray concluded that Café Feruza did not pose a threat to the Embassy. Id. Ultimately, Mr. Bray, the chief security official at the Embassy, determined that no request for removal of any buildings adjacent to the Embassy was necessary and determined that it was not necessary to purchase any properties adjacent to the Embassy. Id. ¶¶ 11-12.

Joseph Presel, the United States Ambassador to Uzbekistan from December 1997 to October 2000, took the position that the United States Embassy should, in all respects, act as a good neighbor. Ex. C ¶¶ 3 & 8. No one on the Embassy staff ever requested that Ambassador Presel authorize a request to the Government of Uzbekistan to remove Café Feruza or any other building around the Embassy. Id. ¶¶ 10-12. Such a request would have been contrary to the policies set by Ambassador Presel for interaction with the Embassy's neighbors. Id. ¶ 12.

In December 1999, with no prior warning from the Government of Uzbekistan, Café Feruza was dismantled and removed from the Park. Complaint ¶¶ 15-16; Ex. A ¶ 10; Ex. B ¶¶ 17-19. Plaintiff concedes that "**local authorities in Tashkent** forcibly **took** and destroyed her cafeteria." Complaint ¶ 1 (emphasis added). In the Complaint, Plaintiff further states that "On or about December 23, 1999, the local authorities in Tashkent forcibly expelled Mrs. Atamirzayeva from Feruza. They seized the property and destroyed the cafeteria." Complaint ¶ 16.

On the first day of the dismantling and removal of Café Feruza, a General Services Assistant and Procurement Agent at the Embassy, Yuri Komarov, was notified of construction activity in the Park. Ex. A ¶¶ 8-10. As the Embassy employee responsible for ensuring that utility services were available to the Embassy, Mr. Komarov was regularly notified by the security detail of any construction activities occurring around the Embassy. Id. ¶ 9. In this instance, Mr. Komarov proceeded to the Park where he was met by Shavkat Kasymov, the Hokim of the Chilanzar District of the City of Tashkent. Id. ¶¶ 11-12. As the Hokim, Mr. Kasymov was the highest ranking government official in the Chilanzar District. Id. ¶ 12. A member of the local militia, or police officer, was with Mr. Kasymov, as well as several laborers who had a tractor. Id. Mr. Komarov asked Mr. Kasymov, the Hokim, what was happening. Id. ¶ 13. Mr. Kasymov stated that a decision had been made to remove Café Feruza from its location in the Park. Id. According to Mr. Kasymov, the removal was part of a Tashkent city-wide effort to improve security following the series of terrorist bombings in Tashkent earlier in the year and the city also felt that removal would also add to the security of the Embassy. Id.; see also, Ex. B ¶ 10. Given that the Embassy was not involved in the removal of the Café, Mr. Komarov

thanked the Hokim for the information, asked him to take care not to disturb any utility wires or pipes, and returned to the Embassy. Ex. A ¶ 15.

The United States Embassy in Tashkent heard nothing further regarding the removal of the Café until 2003 when Plaintiff's son, Sobir Atamirzayev, began calling and writing the Embassy requesting assistance in obtaining reimbursement from the Government of Uzbekistan for the removal of his mother's Café. Ex. A ¶¶ 17-18; Ex. B ¶¶ 20-22. The Embassy staff, including Yuri Komarov and Ulugbek Sayedkhodjaev, researched the issue and determined that the Embassy staff had played no role in the removal of the Café and, therefore, could not be of assistance to Plaintiff or her son. Ex. A ¶ 18; Ex. B ¶ 22.

## III. STANDARD OF REVIEW: JUDGMENT ON THE PLEADINGS IS PROPER BECAUSE THE ONLY ISSUES TO BE DECIDED ARE LEGAL ISSUES

Pursuant to RCFC 12(c), which is identical to Federal Rule of Civil Procedure 12(c), "[j]udgment on the pleadings . . . is appropriate where there are no material facts in dispute and the [moving party] is entitled to judgment as a matter of law." New Zealand Lamb Co., Inc. v. United States, 40 F.3d 377, 380 (Fed. Cir. 1994); Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001). "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." Peterson v. United States, 68 Fed.Cl. 773, 776 (2005); C. Wright & A. Miller, Fed. Prac. & Proc. Civ.3d § 1367. A motion for judgment on the pleadings may be granted if it appears that Plaintiff can prove no facts that would entitle her to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). While a complaint should be dismissed for failure to state a claim only if it appears beyond a doubt that the plaintiff

can prove no set of facts that would entitle the plaintiff to relief, the Court is not required to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. Id.

In the instant case, for purpose of this motion, the United States accepts all of the material facts plead by Plaintiff. Even assuming the validity of the material facts as plead by Plaintiff, however, the United States is still entitled to judgment as a matter of law because Plaintiff lacks standing and because she has failed to state a claim upon which relief can be granted.

## IV. ARGUMENT

### A. PLAINTIFF LACKS STANDING TO SUE THE UNITED STATES FOR AN ALLEGED VIOLATION OF THE FIFTH AMENDMENT

As a foreign citizen who has no substantial connections with the United States, Plaintiff may not invoke the protections of the Fifth Amendment and, therefore, lacks standing to bring this suit.[5] The Supreme Court has "rejected the claim that aliens are entitled to rights outside the sovereign territory of the United States." United States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990) (Supreme Court held that the Fourth Amendment protection against warrantless searches does not apply to a search of a Mexican citizen's home in Mexico by American agents). In some limited circumstances, the Supreme Court has suggested that an alien located outside the territory of the United States could avail themselves of the protections of the Fifth Amendment, but only "when they have . . . developed **substantial connections** with [the United States]." Id. at 271

[5] As recognized by Judge Allegra in Ashkir v. United States, the precedent is somewhat unclear regarding whether a standing argument is properly asserted under RCFC 12(b)(1) for lack of subject matter jurisdiction or 12(b)(6) for failure to state a claim. Nonetheless, as Judge Allegra concluded, the analysis of a standing defense is the same under either provision of the rules. 46 Fed. Cl. 438, 439 (2000).

(emphasis added); Johnson v. Eisenstrager, 339 U.S. 763 (1950) (the Court ruled that writs of habeus corpus under the Fifth Amendment are not available to aliens arrested in China and imprisoned in Germany following World War II). The Verdugo-Urquidez Court characterized the Johnson Court's rejection of the "extraterritorial application of the Fifth Amendment [as] emphatic." Quoting at length from Johnson, the Verdugo-Urquidez Court stated that a finding of universal extraterritoriality:

> would [be] so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution have even hinted at it. The practice of every modern government is opposed to it.

Verdugo-Urquidez, 494 U.S. at 269 (citations omitted) (quoting Johnson, 339 U.S. at 784).

This reading of the Supreme Court's prior decisions – requiring "substantial connections" with the United States in order to demonstrate standing – is unexceptional, and is consistent with takings jurisprudence. For example, the Supreme Court has applied the Takings Clause to foreign-owned property located within the United States, which is by itself a substantial connection. See Russian Volunteer Fleet v. United States, 282 U.S. 481, 491-92 (1931). Courts have also ruled that foreign property owned by United States citizens is likewise protected by the Constitution, the citizenship of the plaintiff creating the necessary substantial connection. See, Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir.), cert. denied, 474 U.S. 824 (1985). In the instant case, Plaintiff is neither a United States citizen nor is her alleged property located within the United States.

Plaintiff will undoubtedly cite to the Federal Circuit's recent holding in El-Shifa Pharmaceutical v. United States and argue that the ruling in that case stands "for the proposition that the Takings Clause protects the property interests of nonresident aliens located abroad even where there is no demonstrable connection between them or their property and the United States." 378 F.3d 1346, 1352 (Fed. Cir. 2004). In El Shifa, the plaintiffs owned a pharmaceutical plant in Khartoum, Sudan. In 1998, as part of a retaliatory strike against terrorist-related facilities, United States missiles destroyed the pharmaceutical plant. The Federal Circuit upheld the trial court's dismissal of the plaintiffs' Takings Claim because the President's designation of the plaintiffs' plant as enemy property presented a "nonjusticiable political question." Id. at 1362.

Relying upon Turney v. United States, 115 F. Supp. 457 (Ct. Cl. 1953), the plaintiff in El-Shifa urged the Federal Circuit to find that a nonresident alien can seek remuneration under the Takings Clause for property situated in a foreign country. Despite this invitation by the plaintiff in El-Shifa, however, the Federal Circuit refused to issue such a ruling. The court found that "because we think the appellants' taking claim at bottom presents a nonjusticiable political question, we are not required to explore whether Turney enjoys any continuing vitality after Verdugo-Urquidez in order to affirm the decision on appeal." Thus, the Federal Circuit ultimately refused to rule on the issue of standing in El-Shifa, and its discussion of the issue is mere dicta.[6]

---

[6] Even if El-Shifa had reached the standing issue, it is important to note that El-Shifa, like Turney, is factually distinct from the instant case. In El Shifa the government was the party allegedly responsible for the bombings which destroyed the plaintiffs' property. 378 F.3d at 1349. Here, both the United States and the Plaintiff agree that the destruction of Café Feruza was carried out by "local authorities in Tashkent," not the United States. See Complaint ¶ 1.

This Court should also note that the Turney decision does not present as stark a contrast to the rule of Verdugo-Urquidez and Johnson as was urged by the plaintiff in El-Shifa. In Turney, unlike the instant case, there were substantial connections between the United States and both the property and the property's owner. The property at issue was surplus United States Army classified military radar equipment which was inadvertently sold to the buyer as part of a transaction to raise money for the Philippine Government. Turney, 115 F. Supp. at 458-59. The United States ultimately re-took possession of the equipment when the United States Army "repossessed" it from the buyers. Id. at 463. The initial sale of the equipment was managed by the United States on behalf of the Philippine government, which never actually took possession of the equipment. Id. at 458-63. The sales contract named the United States as the seller and two former United States Air Force members, both American citizens, as the buyers (they later assigned their interest in the material to the corporation). Id. at 459. The Philippine corporation to which the equipment was ultimately transferred, was formed principally by the two former American Air Force officers. Id. During the course of the conflict over the equipment, a second agreement was executed between the corporation and the United States Army, in which the corporation agreed to return the equipment to the United States Government in return for a receipt identifying the equipment returned. This second agreement included a statement of the corporation's intent to make a claim against the United States for the equipment that was repossessed. Id. at 460. Before any takings claim was brought, the corporation was liquidated, and the eventual claimant was Edward Turney, who was named as liquidator of the corporation's assets. Id. at 461.

Thus, Turney involved circumstances in which the property at issue had been owned by the United States Government, was sold by the United States to United States citizens, and was the subject of a second agreement between the corporation and the United States for the return of certain equipment. In this situation, the best reading of Turney, in light of the Supreme Court's clear holdings concerning extraterritorial application of the Fifth Amendment, is that there was in fact a sufficient connection to the United States to make the Takings Clause applicable in that case.

No such similarly compelling connections between the United States and either Café Feruza or the Plaintiff have been alleged in this case. Indeed, there are no connections between the United States and either the property or the Plaintiff. The property is located in Uzbekistan. Complaint ¶¶ 5-6. The United States never took possession of the property and, as confirmed by Plaintiff, did not commit the acts leading to the destruction of the property. Id. ¶ 16. Plaintiff is not an American citizen; she did not buy the property from the United States nor has she entered into any contract with the United States relative to the property. Id. ¶¶ 1 & 3.

Moreover, in Turney, the expropriated property was in the hands of the United States following the taking. With the property at issue in the hands of the United States, a foreign sovereign in relation to the Philippine government, the plaintiff would have been unable to seek remuneration for the property in Philippine courts. No such dilemma faces the Plaintiff in the instant case where she could avail herself of the laws and courts of her own country to seek remuneration from the Government of Uzbekistan, which Plaintiff admits undertook the demolition of Café Feruza. See Berlin Democratic Club v. Rumsfeld, 410 F.Supp. 144, 153 (D.D.C. 1976) (Austrian citizen found to lack standing to sue the United States for violations of

the Fourth Amendment, in part, because a foreign citizen "can utilize the laws of his own country to protect himself").

The instant case, in fact, should be resolved exactly as this Court resolved Ashkir v. United States, 46 Fed.Cl. 438 (2000). In Ashkir the plaintiff was a Somali citizen who owned a compound in Mogadishu that included "a hotel, apartment buildings, villas, sports facilities, restaurants, factory space, warehouses, and independent electric and water services." Id. at 439. As part of the United Nations' efforts in Somalia in 1992, the United States military inhabited the compound and used it as a headquarters for peacekeeping forces. Id. Based upon a careful analysis of Johnson, Verdugo-Urquidez, and numerous takings cases, this Court found that the plaintiff lacked the substantial connections required for standing to invoke the Constitutional protection of the Fifth Amendment. The Court concluded that:

> In the instant case, the plaintiff is a nonresident alien and the property in question is in Somalia and thereby outside the sovereign jurisdiction of the United States. As such, it is apparent that neither the plaintiff nor his property possess the requisite substantial connection with the United States that would allow for his invocation of the Takings Clause.

Id. at 444.

The facts in the instant case more fully support dismissal than in Ashkir. In that case, the United States military physically occupied the plaintiff's foreign property. Conversely, in the instant case, Plaintiff admits that the United States did not destroy or take possession of her property.

In short, an alien plaintiff whose property is located outside the United States lacks standing to bring a claim under the Fifth Amendment's Takings Clause unless they can

demonstrate substantial connections with the United States. In only one case in its history, Turney, a case with very unique facts, has the Federal Circuit, or its predecessor court found such a substantial connection. Because none of the unique facts present in that case are present here and there are, in fact, no connections between the Plaintiff and the United States, the instant case must be dismissed. Based upon the facts contained in Plaintiff's Complaint, the Court must find, as a matter of law, that Plaintiff has failed to plead the "substantial connections" required by the Supreme Court to confer standing on a plaintiff to invoke the protection of the Takings Clause of the Fifth Amendment. As such, the Court, we respectfully submit, must dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted.

## B. THE UNITED STATES IS NOT LIABLE FOR TAKINGS EFFECTUATED BY A FOREIGN SOVEREIGN

The Federal Circuit, and its predecessor court, have repeatedly held that the United States is not liable for a taking effectuated by another government. This is true, whether the government that effectuated the alleged taking is a state or local government within the United States or, as in this case, a foreign sovereign. Moreover, the court has found that the United States' use of its diplomatic persuasion or its financial largess as a means of influencing the actions of another government is immaterial.[7] Here, where Plaintiff admits that the removal of

[7]Plaintiff must also demonstrate that the United States' "agent" who allegedly made the alleged "demand" of the Government of Uzbekistan, had the authority to act. Plaintiff, however, has failed to identify the source of the alleged demand, let alone the authority for such action. Thus, having failed to plead this critical information, even assuming a "demand" was actually made, the United States is unable to evaluate, for example, whether this alleged action was simply the act of a rogue employee, for which the United States is not liable under the Fifth Amendment. "When government officers or employees act in contravention of their duties or positions, their actions cannot give rise to a takings claim." Pi Electronics Corp. v. United States, 55 Fed. Cl. 279, 288 (2003)) (*citing* Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 689,

Café Feruza was carried out by the Government of Uzbekistan, the United States cannot be held liable for a taking under the Fifth Amendment, even if it used its diplomatic persuasion or threatened the withdrawal of financial support from the Government of Uzbekistan in an alleged effort to encourage the actions ultimately taken by the foreign sovereign.[8]

In Langenegger v. United States, 756 F.2d 1565 (Fed. Cir. 1985), cert. denied, 474 U.S. 824 (1985), the plaintiffs, United States citizens, brought a takings claim against the United States seeking to recoup the value of their coffee plantation in El Salvador. The plantation was confiscated by the Government of El Salvador pursuant to an agrarian reform program passed by El Salvador's legislature at the urging of the United States. The court assumed, for purposes of the United States' motion for summary judgement, that the United States had tied economic and military assistance to the passage of the agrarian reform and that El Salvador could have anticipated the withdrawal of financial assistance from the United States if the reform legislation was not passed. Id. at 1567. In addition, the court assumed that the United States was providing financial aid for the reform programs and had even assisted in drafting the reform legislation. Id.

The court found that the issue to be resolved in Langenegger was "whether the United States is responsible under the Just Compensation Clause of the Fifth Amendment for the expropriation of a United States citizen's property in a foreign land when the taking was mandated by a foreign sovereign's legislation passed at the prompting of the United States." The court held that "[w]hen considering a possible taking, *the focus is not on acts of others, but on*

---

69 S.Ct. 1457 (1949); Hooe v. United States, 218 U.S. 322, 335 (1910); and NBH Land Co. v. United States, 217 Ct.Cl. 41, 44-45, 576 F.2d 317, 319-20 (1978).

[8]The United States denies that it in any way attempted to influence the Government of Uzbekistan with regard to Café Feruza.

*whether sufficient direct and substantial United States involvement exists*." Id. at 1571 (emphasis in original). The court reasoned that the United States cannot be responsible when it urges a foreign sovereign to act, if, in the end, the expropriation is actually carried out by the foreign sovereign. Indeed, the Langenegger court found that regardless of how pervasive is the United States' influence, when considering whether to impute acts of a third party to the United States:

> **acts of an independent sovereign are excluded *a fortiori*.** Where the actual expropriation is by the hand of a foreign sovereign, the United States cannot be held responsible merely because its activity is that of "friendly" persuasion regarding general policy, common among allies, or when the sole benefit to the United States is the political stability of its neighbors. **Diplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of direct and substantial involvement, however difficult refusal may be as a practical matter.** Such "nebulous forms of United States influence . . . are insufficient to make defendant constructively responsible for the taking alleged."

Langenegger, 756 F.2d at 1572 (quoting Porter v. United States, 496 F.2d 583, 592 (Ct.Cl. 1974) (emphasis added).

Other cases that have addressed the United States' liability where the actual act of expropriation has been carried out by a foreign sovereign or international organization – no matter how substantial the United States' involvement – have repeatedly concluded that the United States' involvement was insufficient to impose liability for a Fifth Amendment taking. See Porter, 496 F.2d at 592 (actions of the government of the Pacific Islands Trust Territory could not be imputed to the United States in the context of an alleged Fifth Amendment taking, even though the Trust Territory government was controlled by the United States Department of

the Interior);[9] Erosion Victims of Lake Superior Regulation v. United States, 833 F.2d 297, 300 (Fed. Cir. 1987) (claims by owners of land on the United States shores of Lake Superior failed to allege facts that constitute substantial and direct involvement of the United States where the plaintiff's property was flooded by acts authorized and carried out by an International Joint Commission, even though the United States was represented on the commission and an employee of the United States government oversaw the operation of the physical acts leading to the flooding); Anglo Chinese Shipping Co. v. United States, 127 F. Supp. 553, 130 Ct. Cl. 361 (1955); Anglo-American Trading Corp. v. United States, 109 Ct. Cl. 859 (1948) (*per curiam*) (United States' request to Government of New Zealand to embargo meat shipments, including those of plaintiff, did not effect a taking by the United States); Best v. United States, 292 F.2d 274, 154 Ct. Cl. 827 (1961) (requisition of property by United States Army in Germany after World War II was not sufficiently direct and substantial to effectuate a taking by the United States); Standard-Vacuum Oil Co. v. United States, 153 F.Supp. 465, 466, 139 Ct. Cl. 113 (1957) (no taking by United States where General MacArthur, as Supreme Commander of Allied Powers, an international organization, delayed ordering Japan to return plaintiff's buildings while Allied Occupation Forces inhabited them).

As the court stated in Erosion Victims, for the United States to be found liable for a Fifth Amendment taking a Plaintiff must allege "facts showing that the United States had a pervasive

---

[9] Certainly if the relationship between the United States and the Pacific Trust Islands chronicled in Porter – where the United States had a formal trust relationship and the Pacific Trust Islands were effectively run by the Department of the Interior – is insufficient to create constructive responsibility, the relationship between the United States and Uzbekistan alleged in this case – where there is nothing more than a limited amount of financial and military support – must also be insufficient. 496 F.2d at 592.

influence over [the foreign sovereign]." 833 F.2d at 300. "In only one case, from [the] predecessor court, Turney v. United States, 126 Ct. Cl. 202, 115 F. Supp. 457 (1953), did [the court] find the government's action towards a third-party to have a direct and substantial enough effect on the plaintiff to require compensation under the Takings Clause ." Casa de Cambio v. United States, 291 F.2d 1356, 1362 (Fed.Cl. 2002). The Cambio court, however, found that Turney did not preclude the conclusion in Langenegger that "where expropriation by foreign sovereign occurred, there was no Fifth Amendment taking by United States even though the United States engaged in 'friendly' persuasion of the foreign sovereign to engage in the expropriation." Id., (quoting Langenegger, 756 F.2d at 1572). The Cambio court, like the Langenegger court, concluded that the Turney decision was distinguishable because of its unique facts. A key distinction between Turney and the plethora of cases holding to the contrary is that in Turney, the United States Army actually took possession of the radar equipment at issue. Turney, 115 F. Supp. at 464. As the court in Turney found, "[w]e think that the taking occurred . . . when the [U.S.] Army officially took **possession of the property**." Id. (emphasis added). There are also other important distinctions between Turney and the long list of contrary decisions: (a) the property at issue in Turney had been given to the Philippines government by the United States; (b) the property had been sold by the United States for the benefit of the Philippine Government; and (c) "[t]he relations, at the time, between our Government and the Philippine Government, were close. Our armed forces had just liberated the Philippines from the Japanese." Id. at 463.

The United States has similarly been held free of liability where the alleged taking was carried out by state governments.[10] For example, in B&G Enterprises, Ltd. v. United States, the Federal Circuit found that the United States conditioned the payment of federal funds to California on the passage of state laws restricting cigarette vending machines to locations that were licensed to sell alcoholic beverages, thereby preventing sales to minors. 220 F.3d 1318, 4320-21 (Fed. Cir. 2000) cert. denied, 531 U.S. 1144 (2001). Based upon these facts, the court held that "the conditional grant of funds to California did not subject the federal government to liability for California's actions." Id. at 1324. Relative to the responsibility of the United States for actions of another government, the court found that "[t]he State of California is an independent sovereign, which itself possesses the authority to enact legislation. . . ." Id.; see also, Griggs v. Allegheny County, 369 U.S. 84, 89 (1962). Like the State of California, the Government of Uzbekistan and the City of Tashkent are independent sovereigns and, regardless of whether the United States conditioned financial support on requested actions, these foreign sovereigns had the ability to reject any request from the United States.

This court reached the same result in Custom Temporary Homes, Inc. v. United States, 5 Cl.Ct. 88, 90 (1984). The court found that "[t]he United States cannot be held liable if private

---

[10] The United States has also been found free of liability where the alleged taking was carried out by a non-governmental entity. In Nat'l. Bd. of YMCA v. United States, the Supreme Court found that the United States was not responsible for damage done to plaintiff's property by rioters in Panama who damaged or destroyed YMCA buildings which were occupied by the United States military. 395 U.S. 85 (1969). The Supreme Court found that the government's involvement in the causation of the damage did "not constitute direct and substantial enough government involvement to warrant compensation under the Fifth Amendment." Id. at 93. In short, a "compensable taking does not occur unless the government's actions on the intermediate third party have a 'direct and substantial' impact on the plaintiff asserting the takings claim." Casa De Cambio, 291 F.3d at 1361.

property is taken by action of a State or local government entity" based, in part, on the fact that under the Federal-Aid Highway Act "States retain all attributes of their sovereignty, and no agency relationship is created between the United States and the State." Id. Plaintiff's Complaint ignores the fact that – whether characterized as a request, a demand, or an order – the Government of Uzbekistan and its capital city of Tashkent are sovereign powers with no obligation to abide by a request from the United States, no matter how forcefully the request is made.[11] Moreover, Plaintiff has not presented a single fact[12] that supports a finding that the Government of Uzbekistan or the City of Tashkent somehow relinquished their sovereignty in the instant case.

Because any expropriation in this case was carried out, as admitted by Plaintiff, by the sovereign government of either Uzbekistan or its capital city Tashkent, the United States is not

---

[11] The discussion of the sovereign status of States reinforces the discussion above that the United States cannot be liable for takings that are the result of actions ultimately effectuated by a foreign sovereign. See Langenegger, 756 F. 2d at 1572 ("acts of an independent sovereign are excluded *a fortiori*").

[12] It appears that, having no evidence to support her allegations, Plaintiff is seeking an opportunity to hunt for facts that might, however tangentially, support her claim. Such fishing expeditions have been held to be inappropriate and should not be countenanced by this Court. DM Research v. College of American Pathologists, 170 F.3d 53, 55-56 (1st Cir. 1999) ("[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition. . . . [But] the discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations.") (emphasis in original). The burden and cost of a fishing expedition in this case – where the property at issue is in Uzbekistan, documentary evidence is most likely also in Uzbekistan, and the United States' witnesses are now literally spread throughout the world – are likely to be extreme and should not be based on the thin allegations contained in Plaintiff's Complaint. Moreover, it is possible that any such fishing expedition will implicate classified facts and documents further increasing the expedition's cost and burden.

subject to liability for a taking under the Fifth Amendment. Given that Plaintiff has failed to allege any facts that would support the imposition of liability on the United States in this case, the Complaint must be dismissed for failure to state a claim upon which relief can be granted.

## V. CONCLUSION

Because Plaintiff lacks standing to prosecute this case and because the United States cannot be liable for the actions of a foreign sovereign, all as more fully set forth above, the United States respectfully requests that the Court grant its Motion and dismiss this case in its entirety for failure to state a claim upon which relief can be granted.

June 5, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

__/s/ James D. Gette______________
JAMES D. GETTE
Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044
(202) 305-1461

Of counsel:
Emily E. Daughtry, Attorney-Adviser
Office of the Legal Adviser
United States Department of State
2430 E Street, NW
Suite 203, South Building
Washington, DC 20037-2800
(202) 776-8436