# EXHIBIT D

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ZOYA ATAMIRZAYEVA, Plaintiff, | ) | No. 02-951 L |
| v. | ) | Honorable Edward J. Damich |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**DECLARATION OF F. JOHN BRAY**

1. I am a United States Citizen and have been in the Foreign Service and an employee of the United States Department of State for 16 years. Currently I am the Regional Security Officer for the United States Embassy in Dakar, Senegal.

2. From April 1998 to August 2000, I was the Regional Security Officer ("RSO") for the United States Embassy in Tashkent, Uzbekistan (the "Embassy"). When I first arrived at the Embassy, I reported to Joe Limprect, the Deputy Chief of Mission, and then to his successor Molly O'Neal. As RSO, I had primary responsibility for the security of the Embassy compound.

3. The locally employed staff assistant to the RSO during my tenure was Ulugbek Sayedkhodjaev. As my assistant and because he was fluent in English, Russian and Uzbek, Mr. Sayedkhodjaev would translate all correspondence, such as letters and diplomatic notes, which I wished to send to the Uzbek authorities. He would also attend all meetings I had with Uzbek authorities to discuss security issues.

4. Following the bombings of two US Embassies in Africa in 1998, RSOs worldwide received updated security standards from the Overseas Policy Board ("OSPB") in Washington, D.C. As a result of the updated OSPB standards, which focused on increasing Embassy protection from large vehicle borne bombs, my staff and I re-evaluated the Embassy with respect to its susceptibility to vehicle borne bombs. We determined that the front of the Embassy compound along the main road posed some threat because of the proximity of the Embassy to the street. As a result we asked the Uzbek government to prohibit large trucks from using the street in front of the embassy. Ultimately, the Uzbek government posted signs indicating that trucks were not to use the street in front of the Embassy.

5. We concluded that there was no threat from large vehicle borne bombs at the back of the Embassy in part because a water canal, which flowed with fairly deep water, created a natural barrier making it impossible to drive a vehicle up to the back of the Embassy. Indeed, although we later placed bollards in the front of the Embassy to prevent vehicles from coming too close to the Embassy, we determined that there was no need to place bollards in the back of the Embassy due to the presence of the water canal.

6. In addition, the back of the Embassy was protected by a fence, a wooded area in the park, and a canine patrol.

7. I did not consider structures in the park to be a security threat.

8. Communications between the Embassy and the Government of Uzbekistan were generally very formal. Requests for security improvements, like the request to preclude truck traffic from the street in front of the Embassy, would have been presented to the Government of Uzbekistan through formal diplomatic correspondence. The formal correspondence generally

took the form of a diplomatic note to the Ministry of Foreign Affairs and was approved by either the Deputy Chief of Mission or the Ambassador. The Ministry of Foreign Affairs would then send the request to the appropriate federal or local government authority for action.

9. The tone at the Embassy related to security issues was set by Ambassador Presel. He was insistent that the Embassy maintain a feeling of openness, that we act as a good neighbor to the residents and businesses around the Embassy, and that any security improvements have minimal impact on our neighbors. Because of his approach, I would never have taken an action that would have a major impact on one of our neighbors without first obtaining his approval.

10. During my tenure at the Embassy, we implemented a number of security upgrades, including:

a. Increased the number of uniformed Uzbek Ministry of Interior police guarding the Embassy. In order to receive approval for these additional uniformed police, the Embassy agreed to pay a stipend to the officers.

b. Instituted vehicle searches at the entrance to the Embassy compound.

c. Installed bollards between the Embassy and the street in front of the Embassy.

e. Requested that the Government of Uzbekistan post signs prohibiting truck traffic from the street in front of the Embassy.

11. I am aware that there was a café located in the park across the water canal behind the Embassy. I have become aware that the café was removed from the Park in December 1999, although I do not have any specific memory of its removal. At no time during my tenure at the

Embassy did I ever discuss this café, or its removal, with any Uzbek officials, nor am I aware of any other Embassy official or staff member having such a discussion with any Uzbek officials.

12. At no time during my tenure at the Embassy did I request that the Government of Uzbekistan remove or close any businesses around the Embassy, nor am I aware of any other Embassy official or staff member requesting such action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 2 June 2006.

F. John Bray