# In the United States Court of Federal Claims

No. 05-1245 L
(Filed: June 20, 2007)

| | | |
|---|---|---|
| **ZOYA ATAMIRZAYEVA,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Takings; Fifth Amendment; RCFC 12(c); RCFC 12(b)(6); standing; "substantial connections" to the United States |

*Perry S. Bechky*, Shearman & Sterling LLP, Washington, DC, for Plaintiff, with whom was *Christopher M. Ryan* and *Wesley J. Heath*, Shearman & Sterling LLP, of counsel.

*James D. Gette*, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, for Defendant, with whom were *Sue Ellen Wooldridge*, Assistant Attorney General, Environment and Natural Resources Division, *Emily E. Daughtry*, Office of the Legal Adviser, United States Department of State.

## OPINION

**DAMICH, Chief Judge.**

This case is before the Court on Defendant's motion for judgment on the pleadings pursuant to RCFC 12(c) and RCFC 12(b)(6). Defendant alleges that Plaintiff, a citizen and resident of Uzbekistan, lacks standing to seek compensation under the Fifth Amendment for the razing of her cafeteria by local Uzbek authorities–allegedly at the behest of United States Embassy officials–in Tashkent, the capital city. For the reasons stated below, the Court hereby **GRANTS** Defendant's motion.

## BACKGROUND[1]

Plaintiff was the owner, since 1994, of a cafeteria called Feruza that was allegedly situated adjacent to the U.S. Embassy in Tashkent, Uzbekistan until December 1999, when it was destroyed by local Uzbek authorities. Compl. ¶ 1. Plaintiff alleges that the local Uzbek authorities seized Plaintiff's property and destroyed Feruza "at the demand of the U.S. Embassy in Tashkent and for its benefit" and that Embassy officials "were physically present and oversaw the demolition of Feruza." *Id.* ¶ 16. Moreover, Plaintiff asserts that a security checkpoint for the U.S. Embassy is now situated where Feruza was once located. *Id.* ¶ 17.

In August 1998, the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania were bombed by terrorists. Beginning in 1999, limited funds were made available to U.S. State Department facilities around the world to buy or lease property adjacent to existing facilities with the purpose, at least in part, of improving security. Answer ¶ 8. On November 29, 1999, President Clinton signed into law the Secure Embassy Construction and Counterterrorism Act of 1999, 22 U.S.C. § 4865, Pub. L. No. 106-113 (1999), which authorized the expenditure of $4.6 billion over five years for the "acquisition of United States diplomatic facilities and, if necessary, any residences or other structures located in close physical proximity to such facilities," and to provide major security enhancements to the diplomatic facilities. *Id.* at Sec. 604(b); *see also* Compl. ¶ 13. Plaintiff opines that the razing of Feruza just weeks later was not mere coincidence. *Id.* ¶ 15. Plaintiff's requests to the U.S. Embassy and local Uzbek officials for remuneration have been denied. *Id.* ¶ 23. In support of her claim, Plaintiff has presented the Court with a letter from an Uzbek official in which he asserts that the United States made an oral "demand" to local Uzbek officials to destroy Feruza for "the sake of the security of the US Embassy." Letter from S. N. Akhmedov, First Deputy Administrator, Chilanzar District Administration, to Z. A. Atamirzayeva (July 15, 2005) (attached to Joint Preliminary Status Report).

## DISCUSSION

Plaintiff claims she is entitled to just compensation under the Takings Clause of the Fifth Amendment, which provides: "[N]or shall private property be taken for public use, without just compensation." Defendant argues that a nonresident alien plaintiff seeking compensation for the

---

[1] The recitations that follow do not constitute findings of fact by the Court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for the purposes of the pending motion.

United States' involvement in the taking of foreign property lacks standing[2] to invoke the Takings Clause unless he or she demonstrates "substantial connections" to the United States.

## A. Standard of Review

On Defendant's motion for judgment on the pleadings, the Court is to assume that all well-pled allegations in the complaint are true and indulge all reasonable inferences in favor of the Plaintiff. *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988). "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005). Accordingly, "[j]udgment on the pleadings . . . is appropriate where there are no material facts in dispute and the [moving party] is entitled to judgment as a matter of law." *New Zealand Lamb Co., Inc. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994).

## B. Analysis

### 1. Standing Not an Issue in *Turney v. United States*

The basis of the Defendant's motion for judgment on the pleadings is that the Plaintiff has no standing.[3] In opposition, Plaintiff, inter alia, points to *Turney v. United States*, 115 F. Supp. 457 (Ct. Cl. 1953), where the Court of Claims[4] held that the representative of a foreign corporation could recover for a taking by the United States of the corporation's property located abroad, based on the Fifth Amendment's requirement of just compensation. Standing, however, was not identified as an issue in that case.

---

[2] Defendant's motion does not raise the issue of whether the Court has personal jurisdiction over Plaintiff as required by the Reciprocity Act. *See* 28 U.S.C. § 2502 (2000). Pursuant to the Reciprocity Act, nonresident alien plaintiffs before the Court of Federal Claims must demonstrate that their home courts would allow American citizens an "equivalent right to judicial access" if they were to bring a suit against the Plaintiff's government. *El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751, 755 (2003), *aff'd*, 378 F.3d 1346 (Fed. Cir. 2004); *see also Nguyen v. United States*, 56 Fed. Cl. 550, 552 (2003).

[3] On June 5, 2006, the Defendant filed a motion for judgment on the pleadings seeking to dismiss this case on two grounds: (1) Plaintiff lacked standing and (2) the United States cannot be liable for the actions of a foreign sovereign. On June 13, 2006, a status conference was held regarding whether Plaintiff should be entitled to fact discovery in order to respond to Defendant's motion. On June 15, 2006, the Defendant moved to withdraw without prejudice its motion for judgment on the pleadings and, on the following day, the instant motion was filed in its place.

[4] In 1982, the Court of Claims was abolished. In its stead, the Court of Appeals for the Federal Circuit and the Claims Court (now the Court of Federal Claims) were established. The decisions of the Court of Claims remain, however, binding precedent for both courts.

The facts in *Turney* are as follows: In the latter half of 1946, the United States transferred the Leyte Air Depot to the Republic of the Philippines, which had become independent of the United States on July 4, 1946. *Id.* at 458. The Philippine government subsequently sold the supplies and buildings at the Depot to two businessmen, Paul B. Ranslow and Vernon E. Childers, who were U.S. citizens.[5] *Id.* at 459. The sale was accomplished through the intermediary services of the Foreign Liquidation Commission (presumably a U.S. agency) which submitted bids for sale to the Philippine government. *Id.* at 458. Three months later, Ranslow and Childers a formed a corporation under the law of the Philippines to manage and sell the property.[6] *Id*. at 459**;** Pl.'s Br., *Turney v. United States*, at 119 (Dec. 22, 1952). Ranslow and Childers transferred their interests in the property to the corporation. *Turney,* 115 F. Supp. at 459. Among the items of property purchased, employees of the corporation discovered classified military radar equipment (of which the United States was unaware). *Id.* When the United States was informed about the military radar equipment, it sought to reclaim it. *Id.* While negotiations were under way between the United States and the corporation, the Philippine government, at the suggestion of representatives of the United States, placed an embargo on exportation of any materials at the Leyte Air Depot. *Id.* at 460. Eventually, the embargo was lifted for property other than the disputed radar equipment. *Id.*

With the agreement of the Philippine government, U.S. Army Captain Royce, with a team of enlisted men, segregated the radar equipment at Leyte. *Id.* Royce and the corporation entered into a written agreement whereby the radar equipment would be returned to the United States and a "full receipt" for the equipment would be given to the corporation. *Id.* In the agreement, the corporation stated that it intended to make a claim against the United States for losses in connection with the equipment. *Id.* Soon thereafter, the corporation was liquidated, and Edward Turney, a U.S. citizen, was designated liquidating trustee. *Id.* at 460-61.

Initially, the Philippine corporation brought suit against the United States, but later Turney was substituted as plaintiff.[7] The Court of Claims held that a Fifth Amendment taking had occurred on October 13, 1947, when U.S. Army Captain Royce and his team of enlisted men segregated the radar equipment at Leyte. *Id.* at 464.

---

[5] Def.'s Exceptions and Br., *Turney v. United States*, at 240 (May 1, 1953).

[6] The *Turney* court did not identify the corporation as Philippine. In a later case, *Seery v. United States*, 127 F. Supp. 601 (Ct. Cl. 1955), the Court of Claims stated: "In the *Turney* case . . . the plaintiff was an alien corporation. . . ." *Id.* at 484. The *Seery* court did not explain how it arrived at this conclusion. Technically, however, the court was wrong, as the plaintiff was Edward Turney, a U.S. citizen, who was the liquidator of the corporation. Second Am. Pet., *Turney v. United States*, at 1 (Oct. 26, 1949).

[7] The corporation's petition was amended on October 26, 1949, to substitute Turney as plaintiff. Def.'s Exceptions and Br., *Turney v. United States*, at 235 (May 1, 1953).

In *Turney*, the only mention of standing as such is in plaintiff's brief, which states that "defendant conceded the right of plaintiff to maintain this action in the Court of Claims." Pl.'s Br., *Turney v. United States*, at 116 (Dec. 22, 1952). There is no discussion of standing in the court's opinion. This may have been because the plaintiff (Turney, the liquidator) was a U.S. citizen. The concession may also have been an allusion to the fact that the suit had been brought under the name of the Philippine corporation, and the plaintiff was later changed to Turney, the liquidator of the corporation.[8]

In any event, in discussing the applicability of the Fifth Amendment Takings Clause, the court did not focus on the actual plaintiff in the case; instead, it focused on the taking of property owned by the Philippine corporation. *See Turney*, 115 F. Supp. at 463-64. The court framed the issue in terms of the applicability of the Takings Clause to the "repossession" by the United States of property owned by the Philippine corporation: "[The property] was repossessed from the corporation in whose shoes the plaintiff stands. We now consider whether the repossession was a 'taking,' covered by the Fifth Amendment." *Id.* at 463. The court looked to the time of the taking that it had determined (October 13, 1947), when the property was owned by the Philippine corporation. *Id.* at 464.

Although the court focused on the taking of the property of a foreign corporation, the thrust of the court's reasoning concerned the general proposition of the applicability of the Takings Clause in foreign countries. The United States broadly argued that the Takings Clause did not apply outside the United States. *Id.* In rejecting this argument, the court merely adopted the contention of the plaintiff to the contrary, noting that there was no decision directly on point. *Id.* According to the opinion, plaintiff had argued that the Takings Clause had been applied to property belonging to a resident alien and situated in the United States, *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931), and to property belonging to an American citizen and situated abroad, *Wiggins v. United States*, 3 Ct. Cl. 412 (1867). Plaintiff had also distinguished the case of *Ross v. McIntyre*, 140 U.S. 453 (1891), in which the Supreme Court had refused to apply the right of trial by jury to an American convicted by a U.S. consular court in Japan, by noting that it denied the extraterritorial application of the constitutional right to trial by jury, not of the Takings Clause. The contention of the plaintiff was that "the right of just compensation for property taken, which can, without inconvenience or practical difficulty, be applied to a taking abroad, should . . . be applied."[9] *Turney*, 115 F. Supp. at 464. Thus, although the opinion mentions the cases of (1) a resident alien plaintiff with property located in the United States, (2) a U.S. citizen with property located abroad, and (3) a U.S. citizen convicted abroad without a jury, it is difficult to conclude that the court, in laying down the general rule just quoted, had consciously opined on the issue of the standing of a foreigner to sue in a U.S. court for a taking of his or her property situated abroad. Indeed, it appears that the court was reciting these cases

[8] *See* note 6, supra.

[9] The contention of the plaintiff was framed in the negative. The quotation frames it in the positive, but the meaning is not changed.

merely to show that there was no precedent to the contrary, rather than exploring the various permutations of U.S. citizen, resident alien, nonresident alien, property located in the United States, and property located abroad.

What seemed important to the court in *Turney* was the involvement of the United States in the taking. Just before its discussion of the extraterritorial application of the Takings Clause, the court found that "the taking occurred on October 13, 1947, when the Army officially took possession of the property," and that the plaintiff was "entitled to recover its fair value as of that date." *Id.* at 464. Leading up to this determination, the court went into some detail regarding the relations between the United States and the Philippines. The court noted that the relations at the time between the United States and the Philippines were "close." *Id.* at 463. It also noted that the embargo imposed by the Philippine government on the radar equipment at the request of the United States "put irresistible pressure upon the corporation to come to terms with the United States Army." *Id.* Thus, in addition to the fact that the United States actually effected the taking, the discussion leads to the conclusion that the court felt that the Philippine government was acting as the virtual agent of the United States.[10]

### 2. What is "Standing"?

Standing can be a slippery principle. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 751 (1984) (standing incorporates concepts "concededly not susceptible of precise definition"). Cases and commentators have distinguished constitutional standing requirements and prudential standing requirements. *E.g.*, *Warth v. Seldin*, 422 U.S. 490, 498-501 (1975). "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III." *Id.* at 498. Clearly, this is not the issue here. The prudential standing inquiry is essentially "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500. Note that the focus of the prudential standing inquiry is on the plaintiff's position–as it is in the instant case. Defendant's standing argument is whether the Plaintiff has substantial connections to the United States in order to bring suit in the first place. This is not the focus of the opinion in *Turney*. As this Court has pointed out above, the focus in *Turney* is on the involvement of the United States in the taking; it is not on the status of the owner as a nonresident alien. In other words, the question in a standing inquiry is, "May this person argue in court that the United States is responsible for a taking?"–not, "Does the Takings Clause apply in these circumstances?"

Another case that focuses on the involvement of the United States in the taking and not on the plaintiff's position is *Langenegger v. United States*, 756 F.2d 1565 (Fed. Cir. 1985).

---

[10] In fact, the opinion states: "[Officials] of the United States Army agreed that an officer or enlisted man of the Army would be designated who should act as an *agent* of the Philippine Government in supervising the segregation and security of the radar." *Turney*, 115 F. Supp. at 460 (emphasis added).

Judging the level of involvement of the United States in the taking of property located abroad eventually evolved into the "direct and substantial" participation rule of *Langenegger*. *Id.* at 1571. Standing, however, was not an issue in *Langenegger*. As the owners of the property (and the plaintiffs) in *Langenegger* were U.S. citizens, the issue was not their standing to sue but whether they were entitled to relief for foreign property expropriated by a foreign government because of pressure brought to bear on that government. *Id.* at 1567, 1572. Having no threshold question concerning whether this kind of plaintiff may sue, the court could proceed immediately to examine the extent of the United States' involvement in the alleged taking.

### 3. The Substantial Connections Test

The substantial connections test for standing that the Defendant urges on the Court in this action is found in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).[11] In *Verdugo-Urquidez*, Rene Martin Verdugo-Urquidez, a citizen and resident of Mexico, was arrested by Mexican authorities on drug-related offenses and later by U.S. Marshals after having been transported to a border patrol station. *Id.* at 262. The U.S. Drug Enforcement Agency (DEA), working with Mexican officials, then searched Verdugo-Urquidez's Mexican residences. *Id.* At trial, Verdugo-Urquidez moved to suppress evidence that was seized during the searches as violating the Fourth Amendment. *Id.* at 263. The trial court agreed with the defendant, and its decision was affirmed on appeal. *Id.* Ultimately, however, the Supreme Court held that Verdugo-Urquidez could not invoke the protections of the Fourth Amendment: "At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico. Under these circumstances, the Fourth Amendment has no application." *Id.* at 274-75. Earlier in the opinion, the Court noted that "Respondent is an alien who has had no previous significant voluntary connection with the United States." *Id.* at 271. Although the issue of standing is technically irrelevant in *Verdugo* as Verdugo-Urquidez was a defendant in a criminal action, the issue was analogous to standing; that is, the issue was "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500. In this sense, plaintiff Verdugo-Urquidez did not have "standing" to make an argument based on the Fourth Amendment.

---

[11] In *Verdugo-Urquidez*, the Court uses variously: "sufficient connection," "substantial connections," "significant voluntary connection," "substantial connection," "voluntary connection," "attachment," and "voluntary attachment." *Verdugo-Urquidez*, 494 U.S. at 265, 271, 274. "Voluntary" seems necessary only in the context of *Verdugo-Urquidez*, where the plaintiff was in the custody of the United States. "Significant" does not seem different from "substantial" in the Court's usage in *Verdugo-Urquidez*. Therefore, this Court adopts the Defendant's phrase, "substantial connections," as adequately capturing the concept as described in *Verdugo-Urquidez* for purposes of this case.

**4. No Clear Precedent On Standing Issue**

Research conducted by this Court reveals that there are only three precedential takings cases that cite *Turney* and that involve a foreign plaintiff *and* property located abroad: *Camacho v. United States*, 494 F.2d 1363 (Ct. Cl. 1974), *Porter v. United States*, 496 F.2d 583 (Ct. Cl. 1974), and *El-Shifa Pharm. Indus. Co. v. United States,* 55 Fed. Cl. 751 (2003), *aff'd*, 378 F.3d 1346 (Fed. Cir. 2004) ("El-Shifa"). Only one of these, *El-Shifa*, dealt with standing.

*Camacho* involved an alleged taking of land in Saipan during World War II. *Camacho*, 494 F.2d at 1364. Between the two World Wars, Saipan was governed by Japan under a mandate from the League of Nations. *Id.* After World War II, Saipan became part of the United States Trust Territory of the Pacific Islands under a delegation of the United Nations. *Id.* at 1364-65. The Court of Claims dismissed plaintiffs' claims based on the statute of limitations, but noted in dictum that "Defendant does not challenge the plaintiffs' position that the United States Constitution guarantees just compensation to an alien for the taking of property in a foreign country. This was decided as a matter of first impression in *Turney*. . . ." *Id.* at 1368. Standing was not mentioned, due in part, one suspects, to the fact that the claim was dismissed on the basis of the statute of limitations. The statute of limitations issue would also likely have been a factor in the defendant's decision to concede the applicability of the Constitution abroad. In any event, the *Camacho* court did not discuss whether persons in the position of plaintiffs had standing to sue the United States.

*Porter* involved an alleged taking by the U.S. government of property located in the Pacific Islands Trust Territory. *Porter*, 496 F.2d at 585. The Court of Claims rejected the government's argument that the Takings Clause did not have application outside the United States, citing *Turney*, but concluded that, under the facts of the case, plaintiffs had failed to demonstrate that it was the United States that had taken their property. *Id*. at 591. Thus, in effect, the court was not faced with the precise issue of whether the Takings Clause applies to a taking by the United States of property located abroad belonging to a foreign owner. (Recall that in *Turney* the court had found that the United States had effected the taking.) Again, the *Porter* court did not discuss whether a person in the position of plaintiff had standing to sue the United States.

Only in *El-Shifa* does one find a foreign plaintiff, an alleged taking abroad, and the issue of standing. *El-Shifa* involved a Sudanese corporation suing the United States for a taking as a result of the destruction of its plant in Sudan by U.S. military operations. *El-Shifa*, 55 Fed. Cl. at 754. In the Court of Federal Claims, the government asserted that the plaintiff, a nonresident alien, had no standing because "the Fifth Amendment does not extend to 'takings' of property located outside the United States and owned by non-citizens." *Id.* at 760. Judge Baskir, although opining that the "Government is probably correct," *id.*, rejected the government's argument because of *Turney,* which he felt bound to follow despite misgivings based on subsequent cases. *Id.* at 762.

The Federal Circuit affirmed Judge Baskir, but on the grounds of nonjusticiable political question. *El-Shifa*, 378 F.3d at 1352. Where the Federal Circuit discussed *Turney*, it largely reported the position of the parties and of the court below on the meaning of *Turney*. *See id.* at 1352. In only two sentences did the Federal Circuit seem to express its own views of *Turney*. It averred that the *Turney* court held that "the seizure by the United States of radar equipment located in the Philippines, owned at the time by a Philippine corporation, constituted a taking," and that, "[a]lthough the *Turney* court did not specifically inquire into the substantial connections of the corporation or its property to the United States, it did reject the government's argument that the Takings Clause lacked extraterritorial application." *Id.*

Thus, no case has been brought to the attention of this Court nor has this Court found through independent research a decision of the Court of Claims or of the Federal Circuit that is binding precedent on the relevant issue: whether a foreign plaintiff or owner has *standing* to assert a claim for just compensation based on the Takings Clause of the Fifth Amendment for an alleged taking by the United States of property located abroad. Indeed, the Federal Circuit in *El-Shifa* seems to adumbrate the distinction between the standing test of *Verdugo-Urquidez* and the issue of the applicability of the Constitution abroad in the statement quoted above, where it juxtaposes: "[T]he *Turney* court did not specifically inquire into the substantial connections of the corporation or its property to the United States," on the one hand, and "it did reject the government's argument that the Takings Clause lacked extraterritorial application," on the other. *Id.* Of course, *Verdugo-Urquidez* was decided many years after *Turney*. In sum, as *Turney* was not concerned with standing, it does not preclude this Court from applying the substantial connections test of *Verdugo-Urquidez* to the case at bar.

**5. The Substantial Connections Test and the Takings Clause**

*Verdugo-Urquidez*, however, involved the Fourth Amendment. In the context of the Fifth Amendment (although not the Takings Clause), the Supreme Court in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), held that the writ of habeas corpus was not available to German nationals held in the custody of the U.S. Army in Germany after World War II, having been convicted of engaging in military activity against the United States in China after the surrender of Germany. For the *Eisentrager* Court the ultimate question in the case was "one of jurisdiction of civil courts in the United States vis-a-vis military authorities in dealing with enemy aliens overseas."[12] *Id.* at 765. The *Verdugo-Urquidez* Court discussed *Eisentrager*, characterizing it as "reject[ing] the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Verdugo-Urquidez*, 494 U.S. at 269.[13]

---

[12] A petitioner for a writ of habeas corpus is even more analogous to a plaintiff in a civil action. Thus, the issue in *Eisentrager* is even more analogous to standing than the search and seizure issue in *Verdugo*.

[13] It is curious that, although *Eisentrager* had been decided before *Turney* and was cited in the *Turney* briefs, the court did not mention it in the *Turney* opinion. *See* Pl.'s Reply Br.,

Regarding the Takings Clause of the Fifth Amendment, nonresident aliens may invoke the Takings Clause to seek remuneration for the expropriation of their property located within the United States. *See Russian Volunteer Fleet,* 282 U.S. at 491-92 (alien corporation may assert a taking with respect to property within the United States). In addition, the Takings Clause is available to a U.S. citizen for property located extraterritorially. *E.g., Seery v. United States*, 127 F. Supp. 601, 603 (Ct. Cl. 1955). However, the precise issue regarding whether a nonresident alien must demonstrate a substantial connection with the United States to have standing to invoke the Takings Clause regarding property outside the United States remains unsettled–at least to the extent that neither the Supreme Court nor the Federal Circuit has squarely addressed the issue.

**a. *Ashkir v. United States***

Lacking authoritative direction from the Supreme Court and the Federal Circuit, this Court is persuaded by the reasoning of the Court of Federal Claims in *Ashkir v. United States*, 46 Fed. Cl. 438 (2000), that the substantial connections test of *Verdugo-Urquidez* should be applied to determine whether a nonresident alien plaintiff has standing to bring a suit against the United States for a taking of property located abroad. *Id. Ashkir* involved a Somali citizen who claimed that the destruction of his property in Mogadishu by a U.S. military operation constituted a taking without just compensation. This Court adopts the reasoning of Judge Allegra in that case.[14] In sum, Judge Allegra based his conclusion on three points: (1) "the 'substantial connections' rationale employed in *Verdugo-Urquidez, Johnson* [i.e., *Eisentrager*] and other cases does not hinge on the specific language of any amendment, but rather on an overarching construct of the limited extraterritoriality of the Constitution and, in particular, the Bill of Rights"; (2) "some courts and commentators have surmised that since the 'substantial connections' requirement bars the defensive assertion of constitutional rights, as a shield, by aliens haled into U.S. courts and subjected to criminal prosecution, it certainly must bar offensive assertions of constitutional rights, as a sword, by nonresident aliens voluntarily seeking redress in civil proceedings"; and (3)

---

*Turney v. United States*, at 310 (May 27, 1953). One surmises that it was because *Eisentrager* involved habeas corpus rather than a takings claim. Recall that the court had distinguished *Ross v. McIntyre* on the basis that it involved the right of trial by jury.

[14] Curiously, Judge Allegra did not feel the need to discuss *Turney*, probably because he saw *Turney* as a case involving a U.S. citizen as plaintiff (i.e., the liquidator of the Philippine corporation). *Ashkir*, 46 Fed. Cl. 438 at 440. This Court, however, as discussed earlier, agrees with Judge Baskir, who felt that the significant party for the *Turney* court was the Philippine corporation. Judge Baskir, in discussing *Ashkir* in *El-Shifa*, concluded: "The *Ashkir* decision, for instance, appears to have simply avoided the impact of *Turney* by classifying it as a case involving a United States plaintiff; of course, this does not alter the fact that the owner of the taken property, as acknowledged in *Seery,* was, prior to liquidation, a foreign corporation." *El-Shifa*, 55 Fed. Cl. at 763-64.

"although not always identified as such, the 'substantial connections' requirement is well-evidenced in numerous cases involving takings claims." *Id.* at 443-444.

In adopting Judge Allegra's rationale, this Court wants to make clear that the result is not a repudiation of the general principle that the Takings Clause of the Fifth Amendment has extraterritorial application. This is what *Turney* and many other cases hold. Instead, the result is that the threshold question of standing is to be resolved by the application of the substantial connections test of *Verdugo-Urquidez*. Once a nonresident alien owner has established substantial connections with the United States, he or she may proceed to argue that he or she is entitled to compensation under the Fifth Amendment for the taking of his or her property located abroad. *Turney*, then, would require a look at the involvement of the United States in the taking and a determination whether the Takings Clause could be applied "without inconvenience or practical difficulty."[15] *See Turney*, 115 F. Supp. at 464.

---

[15] The "inconvenience and practical difficulty" in applying the Takings Clause to property located abroad has not been a factor in the relevant cases. It may very well be in this case, where the relations between the United States and Uzbekistan are strained, and it does not appear that Uzbekistan is a democracy in any real sense of the word. For example, the on-line version of *The World Factbook* of the Central Intelligence Agency as of this writing describes the government of Uzbekistan as "authoritarian rule, with little power outside the executive branch." https://www.cia.gov/library/publications/the-world-factbook/geos/uz.html. Furthermore, this source notes that Uzbekistan "still lacks [an] independent judicial system." *Id.* The website for the U.S. Department of State simply states that "Uzbekistan is not a democracy and does not have a free press." http://www.state.gov/r/pa/ei/bgn/2924.htm. In May 2005, "troops opened fire on protestors," and the European Union "imposed sanctions when [Uzbek] authorities rejected calls for an international inquiry." *Id.* The United States threatened to withhold aid, and the Uzbek Parliament has demanded that U.S. forces leave their base in the southern part of the country. *Id.* The website for the U.S. Department of State simply states that "Uzbekistan is not a democracy and does not have a free press." *Id.*

Under these circumstances, there may be little hope for successful discovery of the alleged involvement of the United States in the removal of the plaintiff's cafeteria by the Uzbek authorities. For example, one wonders about Ms. Atamirzayeva's freedom to speak the truth, as it was the Uzbek government that demanded that the local authorities seize her property. Pl.'s Opp'n at 3. Furthermore, in the context of touchy relations with Uzbekistan, the United States might very well–and perhaps justifiably–refuse to divulge the details of its relationship with Uzbekistan in 1999. For example, how will Plaintiff prove the allegation in her complaint that there is evidence of a "secret alliance" between the United States and Uzbekistan? *See* Compl. ¶ 9.

**b. *Hoffman v. United States***

In addition to the Court of Federal Claims, the U.S. District Court for the District of Columbia has also applied the substantial connections test to bar nonresident aliens from asserting Fifth Amendment takings claims, based largely on *Verdugo-Urquidez*, *Eisentrager*, and *Russian Volunteer Fleet*. In *Hoffman v. United States*, 53 F. Supp. 2d 483 (D.D.C. 1999) *aff'd in part, vacated in part*, 17 Fed. Appx. 980 (Fed. Cir. 2001) (unpublished), German citizens, who were successors-in-interest, brought actions against the United States to recover the photographic archives of a German photographer and watercolor paintings by Adolf Hitler, both of which were seized in Germany by the U.S. Army during World War II. *Hoffman*, 53 F. Supp. 2d at 484-85. The case has a complicated history. At one point, however, it was appealed to the Federal Circuit, where the plaintiffs challenged the district court's ruling regarding nonresident aliens and the Takings Clause. *Hoffman*, 17 Fed. Appx. at 980. In an unpublished (and therefore non-precedential) decision, the court affirmed the district court's holding on the Fifth Amendment takings claims because plaintiffs failed "to establish 'substantial connections' to the United States." *Id.* at 986. The Federal Circuit's opinion did not mention *Turney*.

**c. *Rosner v. United States***

Similarly, the U.S. District Court for the Southern District of Florida has held in *Rosner v. United States*, 231 F. Supp. 2d 1202 (S.D. Fla. 2002), that a foreign plaintiff must have substantial connections with the United States in order to overcome a motion to dismiss for failure to state a claim in a takings case where the property allegedly taken is located abroad. *Rosner* involved the "Nazi Gold Train." *Id.* at 1204. In the waning months of World War II, the Hungarian government, which was an ally of Nazi Germany, loaded a train with valuables looted from Hungarian Jews and sent the train on its way to Germany. *Id.* The U.S. military seized the train in Salzburg, Austria. *Id.* The valuables were dissipated over the ensuing years. *Id.* at 1205. The plaintiffs were Hungarian Jews, or their descendants, whose valuables were on the train. *Id.* at 1203-04. The court found the relevant time to be the time of the alleged taking, when the plaintiffs were not U.S. citizens and the property was in Austria. *Id.* at 1213. The court based it reasoning on *Verdugo-Urquidez* and was persuaded by Judge Allegra's analysis in *Ashkir*. *Id.* at 1213-14.

In the instant case, the Plaintiff and owner of the property is a nonresident alien. The property is located outside the United States–specifically, in Uzbekistan. The Uzbek authorities forcibly expelled Plaintiff from her property. Compl. ¶ 1. The Plaintiff has not alleged substantial connections with the United States; therefore, the Plaintiff does not have standing to invoke the protection of the just compensation clause of the Fifth Amendment for an alleged taking by the United States.

### 6. Substantial Connections in *Turney*

Finally, it is noteworthy that had the substantial connections test been applied to *Turney*, the Philippine corporation would have had standing. This Court, thus, agrees with Defendant's conclusion in this regard. *See* Def.'s Mot. at 6-7. First, Ranslow and Childers, U.S. citizens, bought the Leyte Air Depot property (which had lately been the property of the U.S. government). *Turney*, 115 F. Supp. at 459, 463. Second, Ranslow and Childers assigned their interests in the property to the Philippine corporation, which they were in the process of forming. *Id.* at 459, 463; Pl.'s Br., *Turney v. United States*, at 119 (Dec. 22, 1952). Third, Ranslow and Childers were the active owners of the corporation: Childers was notified about the radar; Ranslow held a conference with the U.S. military authorities, and he refused to allow U.S. agents to enter the depot; and Childers and Ranslow engaged in negotiations with the U.S. government and with the Philippine government over the property. *Turney*, 115 F. Supp. at 459-60. Fourth, the U.S. Army made a written agreement with the Philippine corporation on November 11, 1947, concerning the property. *Id.* at 460, 462; *see Hoffman*, 53 F. Supp. 2d at 491 (finding that a contractual relationship with the United States could be a substantial connection). Thus, even though the *Turney* court did not identify the need for substantial connections between the owners and the United States, the corporation in *Turney* would have satisfied this test, whereas Ms. Atamirzayeva decidedly would not.

### 7. The Substantial Connections Test is Preferable

As the Defendant's motion is based on standing, the Court confines itself to this issue, holding that Plaintiff does not have standing to bring this action because she lacks substantial connections with the United States. However, the Court has alluded, in footnote 15, to the possibility that, even if substantial connections with the United States are not required, Plaintiff may have a hard time passing the "without inconvenience and practical difficulty" test of *Turney*. There is also the inquiry into the level of involvement of the United States in the taking, which is required by *Langenegger*. Because both of these issues would seem to entail factual findings, the threshold determination of standing based on the application of the substantial connections test has the additional practical effect of promoting the efficient disposition of this case.

## CONCLUSION

In the instant case, Plaintiff, an Uzbek citizen, lacks standing to invoke the Takings Clause of the Fifth Amendment for the alleged taking of her cafeteria in Uzbekistan because she has failed to demonstrate any substantial connections to the United States. Accordingly, the Defendant's motion for judgment on the pleadings is hereby **GRANTED**. The Clerk of the Court is directed to dismiss this case with prejudice.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge