CLERK'S OFFICE COPY

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**OPINION ANNOUNCING**
**JUDGMENT OF THE COURT**

OPINION FILED AND JUDGMENT ENTERED: 05/07/08

The attached opinion announcing the judgment of the court in your case was filed today. The judgment was entered pursuant to Rule 36. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Each side shall bear its own costs.

Regarding exhibits and visual aids: Your attention is directed to FRAP 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The Clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

JAN HORBALY
Clerk

cc: Wesley James Heath
John T. Stahr

ATAMIRZAYEVA V US, 2007-5159
CFC, 05-CV-1245

# United States Court of Appeals for the Federal Circuit

2007-5159

ZOYA ATAMIRZAYEVA

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Wesley J. Heath, Shearman & Sterling LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Thomas B. Wilner and Christopher M. Ryan.

Ryan D. Nelson, Deputy Assistant Attorney General, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Ronald J. Tenpas, Assistant Attorney General, and John T. Stahr and Kathryne E. Kovacs, Attorneys. Of counsel was James D. Gette, Attorney.

Appealed from: United States Court of Federal Claims

Chief Judge Edward J. Damich

# United States Court of Appeals for the Federal Circuit

2007-5159

ZOYA ATAMIRZAYEVA,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 05-CV-1245,
Chief Judge Edward J. Damich

---

DECIDED: May 7, 2008

---

Before MAYER, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

Zoya Atamirzayeva filed a claim in the Court of Federal Claims seeking compensation under the Fifth Amendment to the U.S. Constitution for an alleged taking of property she owned in Uzbekistan. The Court of Federal Claims dismissed Ms. Atamirzayeva's claim on the pleadings because she did not plead any connection to the United States that would entitle her to relief under the Fifth Amendment's Takings Clause. Ms. Atamirzayeva appeals on the ground that the Fifth Amendment does not require a person deprived of property to have any connection to the United States in

order to be entitled to just compensation for a taking that is attributable to the U.S. government. We affirm.

I

The Court of Federal Claims entered judgment on the pleadings. Therefore, "each of the well-pled allegations in the complaints is assumed to be correct, and the court must indulge all reasonable inferences in favor of the plaintiffs." Atlas Corp. v. United States, 895 F.2d 745, 749 (Fed. Cir. 1990).

According to her allegations, Ms. Atamirzayeva is a citizen of the Republic of Uzbekistan. She resides in Tashkent, the capital of Uzbekistan. Prior to the events that are the subject of her claim, she was the sole owner of a cafeteria located on property next to the U.S. Embassy in Tashkent. The property on which her cafeteria was located was owned by the Republic of Uzbekistan, but Ms. Atamirzayeva owned the buildings on the property.

Ms. Atamirzayeva alleges that in December 1999 officials at the U.S. Embassy made a verbal demand to local authorities in Tashkent that they destroy Ms. Atamirzayeva's cafeteria in order to increase the security of the U.S. Embassy. The following day, local authorities forcibly expelled Ms. Atamirzayeva from her cafeteria, then destroyed it while officials from the U.S. Embassy oversaw the demolition. Ms. Atamirzayeva sought compensation from local authorities and from the U.S. Embassy, but those efforts were unsuccessful. She then initiated this takings action in the Court of Federal Claims.

In its motion for judgment on the pleadings, the government argued that Ms. Atamirzayeva has no claim under the Fifth Amendment because she is a foreign

national whose taken property was in a foreign country. The trial court agreed and dismissed Ms. Atamirzayeva's claim because she pleaded no connection to the United States that would entitle her to compensation under the Takings Clause.

II

The sole question presented on appeal is whether a foreign citizen with no connection to the United States has a right to just compensation under the Fifth Amendment for a taking of property that occurs in a foreign country. Ms. Atamirzayeva argues that the Court of Claims answered that question affirmatively in Turney v. United States, 115 F. Supp. 457, 464 (Ct. Cl. 1953), when it extended the Takings Clause to a claim by a Philippine corporation for property taken in the Philippines. Ms. Atamirzayeva asserts that under the authority of that decision, the trial court's dismissal order must be reversed. Before we address the scope of the Court of Claims' decision in Turney, we turn first to the Supreme Court cases involving the extraterritorial application of constitutional provisions.

A

The Supreme Court has long taken the view that the Constitution is subject to territorial limitations. In Ross v. McIntyre, 140 U.S. 453 (1891), the Court rejected a habeas corpus petitioner's claim that his conviction by a United States consular court in Japan violated the Sixth Amendment right to a jury trial. The Court stated:

> By the constitution a government is ordained and established "for the United States of America," and not for countries outside their limits. The guaranties it affords against accusation of capital or infamous crimes, except by indictment or presentment by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offenses committed elsewhere, and not to residents or temporary sojourners abroad. Cook v. U.S., 138 U.S. 157, 181 [(1891)]. The constitution can have no operation in another country.

Ross, 140 U.S. at 464. The Court further reasoned that giving extraterritorial effect to the right to a jury trial "would be impracticable from the impossibility of obtaining a competent grand or petit jury." Id.

The Supreme Court reached a similar result in the Insular Cases, a series of cases addressing Congress's authority under Article IV, § 3, cl. 2, of the Constitution, which grants Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." In those cases, the Supreme Court concluded that specific constitutional provisions did not extend to unincorporated territories of the United States and therefore did not limit Congress's authority under Article IV. See Downes v. Bidwell, 182 U.S. 244 (1901) (revenue clauses); Dorr v. United States, 195 U.S. 138 (1904) (right to trial by jury); Balzac v. Porto Rico, 258 U.S. 298 (1922) (same); see also Hawaii v. Mankichi, 190 U.S. 197 (1903) (jury and grand jury provisions of Fifth and Sixth Amendments not given effect after annexation).

In United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936), the Court expressed a strict territorial view of the Constitution when it addressed the differences between the federal government's authority over internal affairs and foreign affairs:

> [T]he investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens . . . and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law.

Id. at 318 (emphasis added).

The Court continued to follow that approach in Johnson v. Eisentrager, 339 U.S. 763 (1950), in which the Court held that the Fifth and Sixth Amendments do not confer rights on enemy aliens seeking habeas corpus relief. Citing Downes, the Court warned against disregarding territorial limits on the application of the Constitution by extending to enemy aliens constitutional protections that are not provided to U.S. citizens serving in the military:

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. Cf. Downes v. Bidwell, 182 U.S. 244. . . . None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it.

Eisentrager, 339 U.S. at 784-85.

In Reid v. Covert, 354 U.S. 1 (1957), a plurality of the Court adopted a more expansive view of the extraterritorial application of constitutional protections. Reid involved the convictions by military tribunals of two American women who had murdered their husbands while living at military bases abroad, one in Japan and one in England. Seeking habeas corpus relief, the two women argued that their trials violated Article III, Section 2, of the Constitution and the Fifth and Sixth Amendments. The Court initially ruled against them, relying on Ross and the Insular Cases for the proposition that "the Constitution does not require trial before an Article III court in a foreign country for offenses committed there by an American citizen and that Congress may establish legislative courts for this purpose." Kinsella v. Krueger, 351 U.S. 470, 476 (1956); accord Reid v. Covert, 351 U.S. 487, 488 (1956) (adopting holding of Kinsella). On rehearing, however, the Court accepted their arguments and held that, as

U.S. civilians being tried for capital offenses, the two women were constitutionally entitled to civilian trials. Reid, 354 U.S. at 19.

The plurality opinion in Reid refused to adopt a comprehensive territorial limitation on the scope of the Constitution and proposed that the holdings of Ross and the Insular Cases be limited. The plurality began by rejecting "the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights." Reid, 354 U.S. at 5. Citing Turney among other cases, the plurality then stated that the Supreme Court and other federal courts "have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States." Id. at 8 & n.10. The plurality observed that Congress had "recently buried the consular system of trying Americans," and therefore stated that, "[a]t best, the Ross case should be left as a relic from a different era." Id. at 12. The Reid plurality likewise rejected the reasoning of the Insular Cases:

> The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.

354 U.S. at 14. The plurality did not, however, adopt an unlimited view of the extraterritorial scope of the constitutional provisions at issue in that case. Instead, it relied on the United States citizenship of the habeas corpus petitioners in Reid to distinguish the Insular Cases, stating that those cases "involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship." Id.

The two justices who concurred in the result in Reid would have further limited the Court's holding. Justice Frankfurter would have specifically limited the holding to capital cases. In addition, he suggested that the Court did not need to reject the holdings in Ross and the Insular Cases to the degree that the plurality did. Reid, 354 U.S. at 49 (Frankfurter, J., concurring in the result).

In a separate concurrence, Justice Harlan agreed that military tribunals could not be used to try a civilian in a capital case, but he also agreed with Justice Frankfurter that Ross and the Insular Cases should not be disregarded as "historical anomalies." Reid, 354 U.S. at 65-67 (Harlan, J., concurring in the result). Those cases, he contended, should be understood as teaching that "there is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a specific guarantee altogether impracticable and anomalous." Id. In determining whether Congress has acted in accordance with the Constitution, Justice Harlan wrote, the pertinent question is "which guarantees of the Constitution should apply in view of the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it." Id. at 75 (emphasis in original).

Thirty-three years later, in United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), the Supreme Court took a restrictive view of the extraterritorial application of the Fourth Amendment's prohibition against unreasonable searches and seizures. Verdugo-Urquidez, a Mexican national, was charged with a number of narcotics-related offenses. Before the district court, he moved to suppress evidence seized during

searches of his residences in Mexico by officials from the Drug Enforcement Administration. Id. at 262-63. The district court granted his motion and, on appeal, the Ninth Circuit affirmed, relying on Reid and INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), a case in which the Supreme Court assumed that the protections of the Fourth Amendment extended to illegal aliens in the United States. The Supreme Court reversed the Ninth Circuit's decision, stating that "it was never suggested that the [Fourth Amendment] was intended to restrain the actions of the Federal Government against aliens outside of the United States." Verdugo-Urquidez, 494 U.S. at 266.

Addressing the court of appeals' "global view of the application of the Constitution," the Court in Verdugo-Urquidez rejected "the view that every constitutional provision applies wherever the United States Government exercises its power." 494 U.S. at 268-69. The Court noted that in Johnson v. Eisentrager it had "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States," and it added that the Court's rejection of extraterritorial application of the Fifth Amendment in Eisentrager was "emphatic." Verdugo-Urquidez, 494 U.S. at 269.

Addressing the decision in Reid v. Covert, the Court explicitly rejected the extension of that decision to non-citizens abroad:

> Respondent urges that we interpret [Reid] to mean that federal officials are constrained by the Fourth Amendment wherever and against whomever they act. But the holding of Reid stands for no such sweeping proposition: it decided that United States citizens stationed abroad could invoke the protections of the Fifth and Sixth Amendments. . . . Since respondent is not a United States citizen, he can derive no comfort from the Reid holding.

Verdugo-Urquidez, 494 U.S. at 270. The Court also distinguished several other cases that had extended constitutional rights to aliens, including Russian Volunteer Fleet v.

United States, 282 U.S. 481 (1931), which held that a Russian corporation was entitled to just compensation when the federal government appropriated two vessels being built in the United States pursuant to a contract with the Russian corporation. The Court characterized those cases as involving aliens who had "come within the territory of the United States and developed substantial connections with this country." Verdugo-Urquidez, 494 U.S. at 271. Those cases did not support Verdugo-Urquidez's argument, the Court held, because he had "no previous significant voluntary connection with the United States." Id.

Justice Kennedy joined the majority opinion and also wrote a separate concurrence. In his opinion, Justice Kennedy first noted the importance, in cases involving the extraterritorial application of the Constitution, of the distinction between citizens and aliens, a distinction that he said "follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." Verdugo-Urquidez, 494 U.S. at 275 (Kennedy, J., concurring). He explained, however, that he did not place any weight on the reference to "the people" in the Fourth Amendment as a textual basis for limiting the application of that provision. Instead, focusing on whether the particular constitutional standard at issue should apply to an alien in a foreign country, Justice Kennedy observed that, "in addition to the other persuasive justifications stated by the Court," there were several practical considerations that argued against extraterritorial application of the Fourth Amendment: "The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy

that prevail abroad, and the need to cooperate with foreign officials." Id. at 278. He added that the rights of a citizen, "to whom the United States has continuing obligations, are not presented by this case." Id.

B

In the case before us, the trial court relied on the "substantial connection test" derived from Verdugo-Urquidez and held that Ms. Atamirzayeva did not have a right to relief under the Fifth Amendment because she did not plead any connection to the United States. Ms. Atamirzayeva does not argue that she has pleaded a significant connection to the United States. Rather, she argues that the Court of Claims' 1953 decision in Turney v. United States, 115 F. Supp. 457, does not require a non-resident alien to show any connection to the United States in order to assert a takings claim for overseas property taken by the United States. We agree that the scope of the court's ruling in Turney is of central importance here. We therefore turn to a close examination of the underlying facts and the legal issue decided in that case.

In Turney, the Court of Claims allowed a Philippine corporation to bring an action against the United States for an alleged taking of property located in the Philippines. The corporation's claim arose out of events that took place shortly after the liberation of the Philippines from Japanese occupation near the end of World War II. To provide aid to the new country, the United States transferred to the Philippine government the Leyte Air Depot and all surplus property located at the depot. At an auction for the account of the Philippine government, Paul Ranslow and Vernon Childers, two U.S. citizens who had served in the Air Force during the war, submitted a bid for the depot's

surplus property. Their bid was accepted, and they entered into a contract to purchase the property.

To fund the purchase, Ranslow and Childers entered into an agreement with two residents of Hong Kong. The Hong Kong residents contributed most of the funds, and in return Ranslow and Childers agreed to assign their rights under the contract for the surplus property to a newly formed corporation. Ranslow and Childers were to manage the corporation's sale of the surplus property and would receive 15 percent of the corporation's profits.

Soon after the corporation was formed, employees hired by the corporation discovered that the Air Force had mistakenly left classified military radar equipment at the depot. After learning of the mistake, Childers proposed that the corporation sell the radar equipment to the Chinese Nationalist Air Forces. Childers sought clearance from the American Military Attaché's staff in Nanking, which informed authorities in the United States that the radar equipment remained at the depot. Subsequently, United States Air Force officials initiated negotiations with Childers for the return of the radar equipment, but the parties could not reach an agreement.

United States representatives then made a request to the Chief of the Executive Offices of the President of the Philippines, Mr. Abello, to have an embargo placed on the exportation of any of the surplus property at the Leyte Air Depot. Mr. Abello complied. In response, Ranslow and Childers agreed to allow the radar equipment to be segregated from the other surplus property if Mr. Abello would arrange for the embargo on the remaining surplus property to be lifted. After the radar equipment was segregated, the corporation entered into an agreement to have the equipment returned

to the United States. The agreement included a statement by the corporation that it intended to file a claim against the United States for losses in connection with the return of the equipment. The corporation subsequently filed suit against the United States in the Court of Claims for breach of contract and for a Fifth Amendment taking. The shareholders of the corporation then voted to liquidate the corporation, and Edward Turney, a United States citizen, was appointed as the liquidating trustee and was designated the plaintiff in the action against the United States.

Addressing the corporation's takings claim, the Court of Claims analyzed several issues. First, it concluded that title to the radar equipment passed first to Ranslow and Childers, and subsequently to the corporation. Next, the court concluded that the United States' repossession of the radar equipment constituted a taking, even though the United States did not impose the embargo on the surplus property. The court reached that conclusion by reasoning that the Philippine government "readily complied" with the United States' request to place an embargo on the radar equipment because the two governments shared a close relationship at that time. The embargo effected the taking, the court held, because it "put irresistible pressure upon the corporation to come to terms with the United States Army." 115 F. Supp. at 464.

The court then reached the question whether the Fifth Amendment provides non-citizens a right to just compensation for takings that occur outside of the United States. In a paragraph, the court rejected the government's argument that the Fifth Amendment does not apply extraterritorially. The court observed that the Takings Clause was applied to a taking of a resident alien's property located in the United States in Russian Volunteer Fleet v. United States, 282 U.S. 481 (1931) (Russian

corporation), and to the taking of an American citizen's property abroad in Wiggins v. United States, 3 Ct. Cl. 412 (1867) (taking in Nicaragua). In rejecting the government's position, the court distinguished the Supreme Court's decision in Ross that the right to a jury trial did not extend to a seaman serving on an American vessel who was convicted of murder by a consular court in Japan. The court reasoned that cases such as Ross "do not mean that other constitutional rights, such as the right to just compensation for property taken, which can, without inconvenience or practical difficulty, be applied to a taking abroad, should not be so applied." Turney, 115 F. Supp. at 464. While noting that there is "no decision directly in point," the court concluded that "plaintiff's contention is sound." Id.

Ms. Atamirzayeva argues that the Court of Claims in Turney established a rule, binding on this court, that the Fifth Amendment protects the foreign property interests of non-resident aliens regardless of their connections to the United States. Ms. Atamirzayeva is correct that Turney is binding precedent for this court. In fact, in El-Shifa Pharmaceutical Industries Co. v. United States, 378 F.3d 1346 (Fed. Cir. 2004), we stated that overruling Turney would require an en banc decision by this court. In the El-Shifa case, however, we found it unnecessary to decide whether Turney "enjoys any continuing vitality after Verdugo-Urquidez," and we therefore did not address that question. Instead, we disposed of the plaintiff's claim in that case by holding that the alleged taking presented a nonjusticiable political question. 378 F.3d at 1352.

While Turney is binding on us, we do not believe that it is dispositive of Ms. Atamirzayeva's claim. The Philippine corporation that was the claimant in Turney had three significant connections to the United States. First, the corporation had been

formed by two United States citizens. Second, the corporation received its ownership interest in the surplus property by assignment from those United States citizens. Third, after liquidation of the corporation, a United States citizen was appointed as the liquidating trustee and the plaintiff in the Court of Claims action. Ms. Atamirzayeva, by contrast, has not pleaded any relationship, business or otherwise, with the United States. As pleaded, her only connections with the United States are that her cafeteria was adjacent to the U.S. Embassy and that embassy officials directed the seizure. Her relationship with the United States is therefore not analogous to the relationship between the claimant corporation and the United States in Turney.

To be sure, the court in Turney did not state that the plaintiff was required to demonstrate any connection with the United States. In light of the facts of the case, however, we do not interpret the decision in Turney to have established a blanket rule that the Fifth Amendment protects the foreign property of citizens of every foreign country without regard to their connections with the United States. Such a rule would be far broader than any rule previously adopted by the Supreme Court for extraterritorial application of any constitutional provision. Indeed, reading Turney in the manner that Ms. Atamirzayeva suggests would require us to infer from a single, brief paragraph of analysis a remarkable holding that would far exceed what the facts of the case required the court to decide and would be in tension with the Supreme Court's subsequent decision in Verdugo-Urquidez. The sounder approach is to treat the holding in Turney as limited to the proposition that providing a right to seek just compensation was appropriate under the facts of that case.

Ms. Atamirzayeva argues that under the approach advocated by Justice Kennedy in Verdugo-Urquidez and Justice Harlan in Reid, there is no reason to restrict the right to just compensation under the Fifth Amendment to those who have some connection to the United States. Those concurring opinions, however, do not provide the support that Ms. Atamirzayeva seeks to derive from them. Justice Kennedy emphasized in Verdugo-Urquidez the importance of the distinction between constitutional claims raised by citizens and those raised by "non-citizens who are beyond our territory." And Justice Harlan's opinion in Reid suggested that even civilian dependents of servicemen overseas might not be entitled to full Article III trials for non-capital offenses. Even the broad plurality opinion in Reid does not support Ms. Atamirzayeva's reading of Turney. Although the plurality in Reid cited Turney as a case in which a court applied a constitutional provision extraterritorially, it did so in the context of its discussion of constitutional rights that "protect Americans abroad." 354 U.S. at 9.

Finally, Ms. Atamirzayeva relies on a line of cases referred to as the Trust Island Cases. Nitol v. United States, 7 Cl. Ct. 405 (1985); Juda v. United States, 6 Cl. Ct. 441 (1984); Porter v. United States, 496 F.2d 583 (Ct. Cl. 1974); Fleming v. United States, 352 F.2d 533 (Ct. Cl. 1965). The plaintiffs in those cases were Micronesians who alleged takings of property located in the Trust Territory of the Pacific Islands. In Porter, the court ruled against the plaintiffs because they did not show that a representative of the United States carried out the alleged taking. 496 F.2d at 591. In Fleming, the plaintiffs were found to have lacked legal title to the property at issue (trochus shells that were harvested illegally). 352 F.2d at 537. In Juda and Nitol, the

court found that the plaintiffs were covered by the just compensation clause, but it reached that conclusion based on the "unique relationship" between the United States and the Trust Territory Government and the relationship between the United States and the plaintiffs. Juda, 6 Ct. Cl. at 457-58; Nitol, 7 Cl. Ct. at 414-15 (adopting holding of Juda). Those cases do not support the broad rule urged by Ms. Atamirzayeva, under which a plaintiff could pursue a Takings Clause action for a taking of property in a foreign country even in the absence of any allegation of a relationship between the plaintiff and the United States.[1] Because we believe that the Supreme Court's decisions require such a relationship, and because nothing in Turney or any other decision binding on us holds that a takings action may be pursued in the absence of such a relationship, we affirm the decision of the trial court.

Each party shall bear its own costs for this appeal.

AFFIRMED.

---

[1] In her reply brief, Ms. Atamirzayeva cites the Supreme Court's recent decision in Rasul v. Bush, 542 U.S. 466 (2004). That case held that federal courts have jurisdiction to consider habeas corpus claims by aliens in United States custody in a location under exclusive United States control. Nothing in the Court's opinion in that case bears on the question whether Ms. Atamirzayeva may pursue a takings claim based on actions by the United States in a foreign land.